693 N.E.2d 1 (1998)
In re WTHR-TV and McGraw-Hill Broadcasting Company, Inc., d/b/a/ WRTV-6, Appellants.
STATE of Indiana, Appellee,
v.
Krista M. CLINE, Appellee.
No. 49S00-9709-CR-484.
Supreme Court of Indiana.
February 23, 1998.
*2 *3 Lee B. McTurnan, Steven M. Badger, Matthew W. Foster, Indianapolis, for Appellant WRTV-6.
Michael A. Wilkins, Indianapolis, for Appellant WTHR-TV.
Mark A. Earnest, Indianapolis, for Appellee Krista M. Cline.

ON PETITION TO TRANSFER
BOEHM, Justice.
This appeal arises out of a discovery dispute in a criminal case. At least one television station conducted an interview of the sixteen-year-old defendant while she was in police custody, without the knowledge of her court-appointed lawyer, and broadcast part of the interview. The defendant served subpoenas on several stations for whatever they had relevant to her case, including both the broadcast and unaired ("outtake") portions of the interview, and anything else. The trial court ordered the stations to produce "any unaired footage" in their possession for in camera inspection. Except for one item, an interview of the defendant, we reverse. The Indiana Rules of Trial Procedure require a discovery request to specify the item *4 or information sought with reasonable particularity and establish at least its potential materiality to the case. We hold that the defendant's discovery request, except as it pertained to a copy of the videotaped interview, did not meet this standard. With respect to the interview, we conclude that the defendant has made a sufficient showing and direct that a videotaped copy of the full interview, including outtakes, be produced for in camera inspection. We also hold that neither the First Amendment to the United States Constitution nor Article I, Section 9 of the Indiana Constitution proscribes disclosure of unaired portions of the interview on grounds of privilege.

Factual and Procedural History
On July 7, 1997, sixteen-year-old Krista M. Cline was charged in Marion County with the murder of her daughter, Alexis Cline. The next day public defender Mark A. Earnest was appointed to represent her. At some point after Earnest was retained, without Earnest's knowledge or consent, one or more Indianapolis television stations conducted a videotaped interview with Cline at the jail where she was being held. Parts of the interview were shown on local news programs. It is unclear from the record who arranged and conducted the interview, which media organizations either directly participated or aired any part of the interview, and exactly what was discussed. On July 25, Earnest served subpoenas on WTHR-TV ("WTHR"), the local NBC affiliate on Channel 13, and WRTV-6 ("WRTV"), an ABC affiliate on Channel 6, demanding that the following materials be produced:
Videotape copies of all news footage and tapes (which have not been previously destroyed or reused), aired and unaired, edited and unedited, regarding the death of [Cline's] daughter, Alexis Cline, and regarding the questioning, apprehension, arrest and court appearances of Krista Cline or any other individuals who may have knowledge of this matter.[1]
On July 30, a hearing attended by counsel for all parties was held to discuss the discovery request. WTHR and WRTV (collectively "the stations") resisted production of any outtakes "without judicial review," and asserted a constitutional "reporter's privilege" that precluded compulsory disclosure. Although Earnest had not seen the broadcast portion of the interview and did not know the contents of any outtakes, he maintained that his Sixth Amendment duty to provide Cline effective assistance of counsel required him to "investigate her case," even if any video footage was not used at trial. Earnest also asserted that the material might be relevant to a civil action against the news organizations for alleged interference with the attorney-client privilege. Despite the broad nature of the discovery request on its face, Earnest denied at the hearing that he wanted "confidential sources of information" and stated: "I'm just asking for what my client said."
The State was also represented at the hearing and took no position on Cline's discovery request. The stations maintain that Earnest stated at some point that he did not want the requested materials unless the State had copies of them. They also assert that the State has neither requested nor received copies of any video footage related to the case. However, the record discloses no statement to this effect from Earnest himself, and Cline's reiteration of the discovery request at the hearing was not conditioned on the State's obtaining the information. Cline asserts in her brief that the tapes are desired "[p]roactively, rather than having to wait reactively to see if the State will use them against her in their [sic] prosecution."
*5 The trial court concluded the hearing by ordering the stations to produce "any unaired footage pertaining to [this] cause" for in camera inspection, and indicating that the material would be turned over to Cline if it was determined to be relevant or likely to lead to the discovery of admissible evidence. The court ruled that any constitutional privilege that might exist did not apply under these "limited circumstances." In separate motions to stay the order for in camera production, both stations contended that the order violated the First Amendment to the United States Constitution and Article I, Section 9 of the Indiana Constitution to the extent it required production of unaired video footage. However, the stations offered to make available to Cline copies of any previously broadcast footage in their possession. The trial court issued a stay to allow the stations to appeal. We granted transfer on September 5, 1997.[2]

I. Indiana Rules of Trial Procedure
The Indiana Rules of Trial Procedure generally apply to criminal proceedings in the absence of a conflicting criminal rule. Ind.Crim. Rule 21; Rita v. State, 674 N.E.2d 968, 970 n. 3 (Ind.1996). Rather than discussing how Cline's discovery request might be resolved under the Trial Rules, the parties and supporting amici base their positions largely on claimed constitutional privilege. This Court normally decides constitutional questions as a matter of last not first resort. Town of Beverly Shores v. Bagnall, 590 N.E.2d 1059, 1063 (Ind.1992); cf. Shoen v. Shoen, 5 F.3d 1289, 1298-1302 (9th Cir.1993) (Kleinfeld, J., concurring) (urging that claim of reporter's privilege be resolved under Federal Rules of Civil Procedure rather than on federal constitutional grounds). Accordingly, before any claim of constitutional privilege is addressed, the threshold issue is whether the Trial Rules permit the enforcement of Cline's subpoena.[3]

A. Relevant principles under the Trial Rules

"Our discovery rules are designed to allow liberal discovery with a minimum of court involvement in the discovery process." Richey v. Chappell, 594 N.E.2d 443, 445 (Ind. 1992) (citation and internal quotation marks omitted). Trial Rule 34 enables parties to a lawsuit to request information or material directly from both parties and non-parties. The scope of discovery is governed by Rule 26(B):

*6 Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
Ind. Trial Rule 26(B)(1). The material sought must be described with sufficient particularity: "The request shall set forth the items to be inspected either by individual item or by category, and describe each item and category with reasonable particularity." T.R. 34(B). Rule 26(C) requires that any party or third party from whom discovery is requested may be protected from "annoyance, embarrassment, oppression, or undue burden or expense" and permits a variety of conditions to be imposed. The sum of these provisions is that, as a general proposition, discovery should go forward, but, if challenged, a balance must be struck between the need for the information and the burden of supplying it. Terre Haute Reg'l Hosp. v. Trueblood, 600 N.E.2d 1358 (Ind.1992) (discovery dispute requires court to balance competing interests). The Indiana Trial Rules do not contain the provisions adopted in the Federal Rules of Civil Procedure in 1991 designed to lessen the burden on third parties who are the targets of discovery requests. See, e.g., FED.R.CIV.P. 45(c). Nonetheless, where non-parties to a dispute are involuntarily dragged into court their interest in being left alone is a legitimate consideration in this balancing and they are no less entitled to any protections the Trial Rules afford. Watters v. Dinn, 633 N.E.2d 280, 288-89 (Ind.Ct.App.1994) ("This court will not tolerate, nor should our trial courts tolerate, violations of the Trial Rules which deprive nonparties of the opportunity to invoke the protection which the rules provide....").
Specifically, in the context of a defendant's discovery request in a criminal case, the following test has been applied to determine whether the information is discoverable: (1) there must be a sufficient designation of the items sought to be discovered (particularity); (2) the items requested must be material to the defense (relevance); and (3) if the particularity and materiality requirements are met, the trial court must grant the request unless there is a showing of "paramount interest" in non-disclosure. See, e.g., Kindred v. State, 540 N.E.2d 1161, 1174 (Ind.1989).[4] Trial court rulings within this framework are reviewed for an abuse of discretion. Id.
Although phrased in terms of particularity, materiality, and paramount interest, our decisions in fact reflect a broader range of considerations that bear on permissible uses of discovery. An item has been designated with reasonable particularity if the request enables the subpoenaed party to identify what is sought and enables the trial court to determine whether there has been sufficient compliance with the request. Sexton v. State, 257 Ind. 556, 558, 276 N.E.2d 836, 838 (1972). In contrast, a demand for "all evidence within [the State's] exclusive possession" was properly denied because it was overly broad and non-specific. Brandon v. State, 268 Ind. 150, 158-59, 374 N.E.2d 504, 508-09 (1978) (internal quotation marks omitted). The requirement of particularity has embraced other considerations as well. Shortly after the adoption of the Trial Rules in this State, although regarding the Trial Rules as "not applicable per se in criminal cases," we nonetheless looked to Rule 34(B) in Dillard v. State, 257 Ind. 282, 291, 274 N.E.2d 387, 392 (1971) for guidance as to criminal discovery. Specifically, this Court observed that what constitutes reasonable particularity "will depend on the facts of each individual case, the crime charged, the nature *7 of the items sought to be discovered, the degree of discovery of other items of information, the nature of the defense, etc." Id. In Dillard, the defendant demanded "a copy of any and all inter-office memo, notes, reports... of and concerning the robberies, the investigation of defendant herein and any and all persons suspected, interrogated and detained in connection therewith." Id. at 290, 274 N.E.2d at 391 (internal quotation marks omitted). This was rejected as an impermissible "fishing expedition or an attempted rummaging about in the police files hoping to turn up something to use at the trial." Id. at 292, 274 N.E.2d at 392-93. Although described as a "particularity" requirement, in reality this test also smuggled in the commonsensical elements of a showing that the information is not readily available elsewhere (the "degree of discovery of other items of information" in Dillard) and that the party seeking it is not engaged in a fishing expedition with no focused idea of the size, species, or edibility of the fish.
The requirement of materiality has similarly absorbed related but different concepts. An item is "material" if it appears that it might benefit the preparation of the defendant's case. Id. at 291-92, 274 N.E.2d at 392. The relevance of some information or items may be self-evident. For example, the materiality of the defendant's own pretrial statement is self-evident in most cases, particularly where the statement was a confession given to authorities. Id. at 291, 274 N.E.2d at 392; Sexton, 257 Ind. at 557-58, 276 N.E.2d at 837-38 (trial court erred in refusing to grant defendant's discovery request for copy of written statement he gave to police on the night he was arrested). In other situations, materiality may not be known or easily demonstrated until the information or item is actually examined. Where the only method for determining materiality is production, a specific showing of materiality is not required. Jorgensen v. State, 574 N.E.2d 915, 917 (Ind.1991) (referring to that situation as a "catch-22").
Nonetheless, "[w]here the materiality of the information is not self-evident the [defendant] must indicate its potential materiality to the best of his ability...." Dillard, 257 Ind. at 292, 274 N.E.2d at 392. Cf. Shortridge v. Platis, 458 N.E.2d 301, 306-07 (Ind.Ct.App.1984) (trial court properly denied plaintiffs' motion to require defendant to produce certain documents where plaintiffs failed to establish how any documents in defendant's possession were germane to an issue in the case). Dillard was not tied to the discovery rules as such, but took its main concepts from the Trial Rules: potential materiality may properly be viewed as shorthand for the requirement that the requested item "appears reasonably calculated to lead to the discovery of admissible evidence." T.R. 26(B)(1). This "potential materiality" when the specific nature of the requested item is not known embraces also an evaluation of not only theoretical relevance, but also the availability of the information from other sources, the difficulty of compliance, and some plausible showing as to what information the respondent has and why there is a need to demand it from the respondent.
The third rubric under which we have evaluated discovery demands in criminal cases is whether the party resisting has a "paramount interest" that trumps the presumption of discovery of any relevant matter. The term suggests that some fundamental and important stake is required to resist discovery. However, the depth of the interest in resisting may be no more than inconvenience if the need for it from a given source is minimalfor example, because it is readily available elsewhere without need to drag third parties into court. Whether a sufficient interest has been shown to prevent discovery "will depend upon the type of interest put forth" and "the category of information sought." Dillard, 257 Ind. at 292, 274 N.E.2d at 392. A legitimate interest in keeping the information or items confidential, for example, may suffice to deny discovery. Williams v. State, 275 Ind. 434, 437-38, 417 N.E.2d 328, 331 (1981) (trial court did not err in denying discovery request for police files that detailed results of ongoing criminal investigation because State had "self-evident" interest in keeping that information confidential). Ultimately these factors involve a balancing test that includes evaluation of the relevance of the material, its availability from *8 other sources, the burden of compliance measured in terms of difficulty, and the nature and importance of any interests invaded. This test, as will be seen, begins to look suspiciously like the three-part test some courts find rooted in the United States Constitution when discovery is sought from newsgatherers. Resolution of this case, however, turns only on the application of general principles of discovery, particularly for third parties, to the peculiar interests of a newsgathering organization.
B. Application of the Trial Rules to Cline's blanket request
Here Cline has demanded in blanket fashion all videotaped information in the stations' possession related to her case. With the sole exception of her request for the interview conducted at the jail, she has not specified what she hopes to gather from the stations. Nor has Cline offered any theory of "potential materiality" as to why anything other than the interview might be relevant to her defense, or even why she believes the television stations have anything responsive to the subpoena, or if they do, what it is. As such, aside from the interview, her request amounts to the "fishing expedition" held to be impermissible under the discovery rules in Dillard.[5] Although a party need not specify the information sought where the contents of the item are unknown or unknowable, something more precise than "give me everything related to the case" must be shown. That is particularly true of demands on third parties. Accordingly, except for the interview, Cline's request is beyond the bounds of permissible discovery due to lack of particularity and any showing of materiality.[6]
Cline suggests that in camera review is a reasonable compromise with respect to the other information she has requested. If a party could always obtain in camera inspection irrespective of any showing of relevance, the trial court's order here would be affirmed in full. In camera review to determine materiality or the validity of any objections to production is generally within the trial court's discretion. Canfield v. Sandock, 563 N.E.2d 526, 531 (Ind.1990). As noted, materiality need not be shown prior to disclosure where the relevance of the item is self-evident or the precise nature of the information is unknown. However, in that circumstance, the discovery rules' prohibition on fishing expeditions and burdensome requests would effectively be lost if in camera review could be obtained without a showing of at least possible relevance. The burden on the party ordered to comply with the in camera order is the same as production itself. As with an illegal search or seizure, a fishing expedition is not justified post hac merely because edible fish were found. Accordingly, where materiality is challenged or is unknown, a showing of at least "potential materiality" is generally required to obtain in camera review of disputed items. Because Cline has offered no theory of potential materiality to support her blanket request, the trial court's order for in camera inspection, except with respect to the interview, is reversed.[7]
*9 C. Discovery of Cline's interview
The contents of the interview are not before us, so we, like parties seeking discovery of yet unproduced items, can only surmise as to its materiality. The "potential," to use Dillard`s term, is therefore the test. It is easily met here. Cline offers a number of valid reasons for wanting that information. The interview was broadcast and, for all Cline knows, taped by the State. The State may seek to introduce Cline's statements as admissions by a party opponent. Ind. Evidence Rule 801(d)(2)(A). Cline also suggests the statements may prove to be admissible for offensive purposes. Though we are at a loss to conjure up such a scenario, and Cline came up with none at oral argument when the question was posed, we cannot dismiss it out of hand. In any event, the defense must at least prepare for the possibility of use at trial. And irrespective of whether the State obtains a copy of the questioning, the unique circumstances under which the interview was conducted may yield insights into how to present Cline's defense. What Cline said, and how she said it, may factor into whether to call Cline as a witness and other strategic considerations. Even if the State does not now have the tape, its availability to impeach Cline is a possibility the defense needs to consider in evaluating whether she should testify. Although Earnest can ask Cline about the contents of the interview, Cline may not be able to recall all the details, and certainly may not be able to give her lawyers a reliable view of the impressions she gives the viewer. In sum, that the interview may be beneficial in preparing Cline's defense, and may provide information not obtainable from another source, is not a close question.
The next issue is whether the stations have shown a sufficient interest to deny Cline a copy of the full interview. Newsgatherers assemble and distribute information for commercial gain, often unearthing information of great public interest at considerable expense and effort. They have a valid mercantile interest in protecting their unpublished work against involuntary disclosure, apart from any constitutional considerations. The efforts of a tenacious press should not be subject to commandeering as a substitute for independent defense investigation. If the threat of disclosure has any significant effect on the flow of information, that is an interest worthy of consideration even if, as discussed in Parts II and III, it is not of constitutional dimension. Stated another way, the same considerations the stations urge to support a free press constitutional privilege against disclosure can be seen as interests that, depending on the facts, may suffice to deny discovery under the Trial Rules. Where a media organization is subpoenaed, the Trial Rules require sensitivity to any possible impediments to press freedom. A showing that the information is unique and likely not available from another source should normally be required.
The stations, however, have not established a paramount interest in non-production of Cline's interview. Disclosure will not reveal any confidential sources because the source is already known. To the extent the means of access to Cline are revealed by the tape, that information is presumably already available to Cline. At least under these facts, there is no chilling effect on press informants that would inhibit the flow of information on issues of public concern. Nor is any interest of the sourceCline herself implicated here. A videotaped interview by definition is not given under any expectation of confidentiality on the part of the interviewee. One cannot speak to a television reporter on camera in the reasonable belief that one's comments or identity will be kept secret because all or any part of the interview may be aired in the discretion of the editor. The burden of copying the interview for Cline is minimal. And because the subpoenaed party here is a non-party to the underlying controversya criminal prosecution there is no issue of the defendant's demanding *10 that the State "lay bare its case in advance of trial." Reid v. State, 267 Ind. 555, 562, 372 N.E.2d 1149, 1153 (1978) (internal quotation marks omitted). Rather, this case involves the defendant's entitlement to information in the hands of a third party that may be relevant to the search for the truth in this case. By allowing a party to make discovery demands on non-parties, the Trial Rules were fashioned so that discovery could be had under these circumstances. A copy of the full interview is therefore within the scope of permissible discovery. Subject to in camera review for relevance or any other considerations that bear on its production, it should be made available to Cline.

II. First Amendment Contentions
Even if the outtakes are discoverable under the Trial Rules, the stations contend this is not the end of the inquiry. They argue that the First Amendment to the United States Constitution and Article I, Section 9 of the Indiana Constitution recognize a qualified "reporter's privilege" that would place a heavy burden on anyone seeking involuntary disclosure of unaired video footage.[8] Specifically, the stations urge us to adopt a three-part test that would require Cline to show that: (1) the information is "clearly material and relevant" to the party's claim or defense; (2) the information is "critical to the fair determination of the cause"; and (3) the party has "exhausted all other sources for the same information." Cline responds that the state and federal constitutions do not proscribe disclosure of the outtakes of her interview and that, assuming a qualified privilege does exist, a sufficient showing has been made to overcome it here. Cline observes that this case involves a juvenile charged with murder who was represented by counsel at the time of the interview. Application of a privilege under these facts to thwart her discovery request, Cline contends, would put a constitutional stamp of approval on ethically questionable conduct by the press. Cline maintains that, if nothing else, any privilege must yield to her Sixth Amendment right to effective assistance of counsel and a fair trial.
The stations have the burden of proving the existence of a privilege sufficient to defeat Cline's discovery request. Canfield v. Sandock, 563 N.E.2d 526, 531 (Ind.1990). For the reasons set forth below, they have not done so.

A. United States Supreme Court precedent

This Court has never addressed whether the First Amendment accords a qualified reporter's privilege to refuse to give evidence in a criminal proceeding.[9] On matters of federal constitutional law, the Supreme Court of the United States has the last word, but the decisions of other federal or state courts do not bind this Court. Arizonans for Official English v. Arizona, 520 U.S.____,____ n. 11, 117 S.Ct. 1055, 1064 n. 11, 137 L.Ed.2d 170, 188 n. 11 (1997). The parties seem to agree that the starting pointif not the end pointof federal constitutional analysis in this area is Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Branzburg held that reporters called to testify before a grand jury do not enjoy a First Amendment "conditional" privilege to refuse disclosure of confidential sources or information gathered in the course of reporting. That decision, including the concurrence and two dissenting opinions, occupies eighty-eight pages in the United States Reports. It is not necessary to revisit every nuance of Branzburg. Summarized briefly, it suffices to say that the result and rationale cut directly against the stations' position on the First Amendment. A majority of the Court reasoned that
these cases involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, *11 and no express or implied command that the press publish what it prefers to withhold. No exaction or tax for the privilege of publishing, and no penalty, civil or criminal, related to the content of the published material is at issue here. The use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from any source by means within the law.
Id. at 681-82, 92 S.Ct. at 2657. The same is true in this case. The core First Amendment values that drove the analysis in Branzburg are not threatened by Cline's discovery request. The stations remain free to investigate, publish, and otherwise transmit information on any subject. To the extent an incidental effect on the flow of information raises First Amendment concerns, Branzburg appears to hold that this presents no basis for exempting the press from giving relevant evidence in a criminal proceeding.
Read most favorably to the stations, Branzburg may leave the door open for a qualified reporter's privilege under some circumstances. Branzburg involved a grand jury subpoena, not a third party discovery request. However, we do not view the two as substantively distinguishable. In holding that a reporter could be compelled to reveal confidential sources or information at a grand jury, the Court observed that the press has long been subject to laws of general applicability that may incidentally burden newsgathering activities. Id. at 682-683, 92 S.Ct. at 2657-2658. A discovery demand is fairly seen in this category. Ultimately a grand jury subpoena and a discovery subpoena are justified by the notion that the public has the right to every person's evidence. We also reject the contention that Branzburg is limited to cases in which the reporter personally witnessed criminal activity.[10] Undoubtedly the interest in access to the information is strongest where it uniquely bears on the commission of the crime itself, as opposed to what the defendant or anyone else said about it, but the Court's discussion was not confined to these limited circumstances: "[T]he right to withhold news is not equivalent to a First Amendment exemption from the ordinary duty of all other citizens to furnish relevant information...." Id. at 697, 92 S.Ct. at 2664. Nor does the language of the opinion seem to turn on the fact that in Branzburg the State, not the defendant, sought the information. To the extent that is a factor, it puts the Sixth Amendment rights of the accused in the balance and cuts in favor of access to the information.
Besides Branzburg, the stations do not cite any relevant Supreme Court authority on this subject. Rather, they rely on decisions of lower federal courts and other state courts that have recognized a qualified reporter's privilege and applied some variant of the three-part test outlined above.[11] Most of *12 these cases, however, trace the purported privilege back to Branzburg and specifically to Justice Powell's concurring opinion, which provided the crucial fifth vote rejecting the privilege.[12] The decisions relying on Branzburg for a qualified reporter's privilege took a cue from Justice Powell that in our view was unwarranted. Justice Powell urged that a "proper balance" be struck between the interests of the press and the duty of all citizens to give evidence in criminal proceedings. Id. at 709-10, 92 S.Ct. at 2670-71 (Powell, J., concurring). These comments were made in the context of responding to Justice Stewart's dissent. In Justice Powell's view, Justice Stewart's concern that Branzburg would allow the government to "annex the news media as an investigative arm of the government" was misplaced. Id. at 709, 92 S.Ct. at 2671 (internal quotation marks omitted). Justice Powell's rejoinder emphasized that reporters were not stripped of the defenses that would be available to any other subpoenaed party, such as bad faith or lack of relevance. Id. at 710, 92 S.Ct. at 2671. The point, therefore, was that a lack of constitutional privilege would not result in automatic enforcement of the subpoena, as in fact the discussion in Part I of this opinion demonstrates. Although he did not mention the Federal Rules of Civil Procedure by name, Justice Powell did note the reporter's right to a "motion to quash" and "appropriate protective order." Id.
We also find it difficult to assume that Justice Powell would cast the deciding vote against the privilege and then attempt to revive it in a separate opinion. Indeed, there is no inconsistency between Justice Powell's cautioning respect for reporters' "legitimate First Amendment interests" and rejecting testimonial immunity for the press. Id. at 710, 92 S.Ct. at 2671. Read in pari materia with the majority opinion that Justice Powell joined, his concurrence is better seen as a caveat to lower courts that Branzburg should not be read to eviscerate all First Amendment protections for newsgatherers. Finally, the reporters in Branzburg and Justice Stewart in dissent urged recognition of virtually the same three-part test that the stations argue should be adopted here. Justice Powell opined that "the essential societal interest in the detection and prosecution of crime would be heavily subordinated" if Justice Stewart's proposed test were the law. Id. at 710 n. *, 92 S.Ct. at 2671 n. *. We cannot read Branzburg to find the United States Constitution to require the very test that was rejected in that case.[13]
*13 If there were any doubt on the point, subsequent Supreme Court decisions discussing Branzburg give no reason to believe the Court meant anything other than what it said: no qualified reporter's privilege exists under the First Amendment. For example, in a unanimous opinion dealing with a different privilege issue the Court stated: "In Branzburg, the Court rejected the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in confidence without a special showing that the reporter's testimony was necessary." University of Pennsylvania v. E.E.O.C., 493 U.S. 182, 201, 110 S.Ct. 577, 588, 107 L.Ed.2d 571 (1990). The following year, Cohen v. Cowles Media Co., 501 U.S. 663, 669, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991) declared of Branzburg: "[T]he First Amendment [does not] relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source." In sum, the decisions construing Branzburg to recognize a qualified reporter's privilege in our view have misread Supreme Court precedent.
B. First Amendment values do not compel recognition of the privilege
Precedent aside, the stations raise a number of interesting contentions as to possible effects on press freedom if they are compelled to disclose video outtakes in response to discovery subpoenas. To address these points, we assume without deciding that Branzburg did not completely close the door to a qualified reporter's privilege based on the federal constitution. We conclude, however, that the stations have not made the case for recognizing the privilege as to the interview even if the question is an open one as a general proposition.
The gravamen of the claim, as in Branzburg, is a possible chilling effect on the flow of information on matters of public concern. If confidentiality cannot be guaranteed, the argument goes, some people will not speak to the press and meaningful news reporting will be jeopardized. This concern is not presented in this case where the source is the defendant herself and there is no claim of confidentiality.[14] It is more difficult to gauge the stations' contention that information will be withheld from the press even if the source's confidentiality can be guaranteed. The Supreme Court was not persuaded by this contention in Branzburg, concluding that the data at that point did not establish a chilling effect. Branzburg, 408 U.S. at 693-95, 92 S.Ct. at 2662-64. Common experience since Branzburg does not seem to suggest a different result today. Not long after Branzburg was decided, an unprecedented era of aggressive investigative reporting, beginning with the Watergate scandal, was born. If the abundance of information that is currently available on television, radio, the Internet, and in printed form is any guide, public debate is "uninhibited, robust and wide-open," New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), notwithstanding reporters' civic obligation to give evidence in criminal proceedings. The proponents of any privilege must carry the burden of establishing the need for it. The stations have not shown a chilling effect and we have not been given any reason beyond pure supposition to believe one exists. Certainly in this case, where the source is already known and there is no reasonable expectation of confidentiality, the claim is meritless.
The stations also argue that compelled disclosure of unaired outtakes might encourage *14 prompt destruction of that data to foreclose the possibility of producing the outtakes in response to a subpoena. Information of possible public interest will then have been prematurely destroyed. In light of apparent industry custom to recycle videotapes and eventually erase unaired portions, the validity of this claim seems questionable, and at least undocumented on the record before us. Moreover, businesses of all kinds routinely make decisions about what information to keep and what to discard, typically based on a range of considerations, including the likelihood of use in a future lawsuit. It is purely speculative that the media will destroy outtakes solely to avoid turning them over in response to a discovery request. If the information is of sufficient public concern, mercantile interests will dictate that the information be preserved irrespective of this consideration. Perhaps more importantly, the stations assert a right to keep the information from the public in the name of preserving it. If it is never to see the light of day, it is difficult to see the public value in its preservation.
The stations suggest that disclosure of outtakes will reveal insights into the minds of television editors and chill reporting of crimes of public interest. Outtakes necessarily reveal what was determined not to be worthy of publication, but the effect on press freedom from this disclosure is once again speculative. Nor does this appear to present any basis for a First Amendment privilege. Cf. Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (in public figure's defamation suit against editor of television program, First Amendment did not proscribe inquiry into editor's state of mind regarding the editorial process).
The stations maintain that compliance with discovery subpoenas will distract reporters and editors from doing their job and impose a drain on resources and time. Although it is possible to envision a situation in which compliance is so time-consuming that reasonable ability to report the news is undermined, we do not have that case here. As noted above, Cline is entitled only to a copy of the full interview conducted with her while she was in police custody. There is no reason to suppose that compliance with that request imposes any significant burden. In holding that reporters could be forced to reveal confidential information and sources at a grand jury, Branzburg implied that the time required to comply with the subpoena provides no basis for a constitutional objection. If the claim is that somehow the media are exempt from the obligations of citizenship because compliance may distract them from a higher calling, we reject that just as we reject similar claims from public officials, clergy, and others. See, e.g., Clinton v. Jones, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).
The stations also argue that defense lawyers will single out the press as a short cut to criminal discovery and that subpoenas such as Cline's may become routine if for no reason other than to develop a paper trail to defend against possible claims of ineffective assistance of counsel. This amounts to an assertion that the discovery process will be used for an improper purpose. Use of discovery in bad faith is proscribed under both the First Amendment and the Trial Rules. See Branzburg, 408 U.S. at 709-10, 92 S.Ct. at 2670-71 (Powell, J., concurring) (cautioning that Branzburg should not be read to sanction "harassment" of the press). In this respect, the Trial Rules and First Amendment are overlapping, if not coextensive. As explained in Part I, the press may have a range of legitimate reasons to resist a discovery request under state law. If a request is frivolous then sanctions are available. The reasons urged here for recognizing a constitutional privilege, including harassment or improper purpose, may be viable grounds to resist disclosure under the Trial Rules irrespective of First Amendment considerations. Accordingly, trial courts should be sensitive to any claim of improper purpose when a newsgatherer objects to a discovery subpoena. But this must be done on a case by case basis; the possibility of abuse does not justify immunity from discovery that the stations seek. Unless and until this horrible shows up at a real parade we are unwilling to assume it as a basis for decision.
The stations' constitutional claim ultimately turns on the breadth of the First Amendment's "implicit guarantee against undue interference with the acquisition of *15 knowledge." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12-22, at 976 (2d ed.1988). To be sure, the First Amendment's scope is not limited to direct restrictions on speech or assembly. Some newsgathering activities are constitutionally protected for prophylactic reasons to ensure the "free discussion of governmental affairs." Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 604, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) (press and public have First Amendment right of access to criminal trials) (internal quotation marks omitted). Justice Brennan referred to this sort of consideration as the "structural" component of the First Amendment. As he put it, the First Amendment is concerned with fostering "indispensable conditions of meaningful communication," but this protection must be applied with "discrimination and temperance" and in consideration of possible encroachment on other important interests. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 587-88, 100 S.Ct. 2814, 2833-34, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring). The sum of this is that even assuming an incidental chilling effect on the flow of information, the prophylactic scope of the First Amendment must yield where another important interest is implicated. In giving way to the societal right to every person's evidence, structural First Amendment considerations show no hint under current precedent that special protection for the press is required. Nor have we been given reason to believe it is necessary.
We agree with Justice Powell's Branzburg concurrence that an unnecessarily high threshold for obtaining evidence from reporters, tantamount to a presumption of non-discoverability, might upset the fair balancing of interests (largely based on discovery rules) that already occurs without the requirement of a special showing. As the Second Circuit observed in rejecting one of the first reported claims of First Amendment newsgatherer's privilege in 1958:
Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press.
Garland v. Torre, 259 F.2d 545, 548 (2d Cir.1958). Both criminal defendants and society in general have a major stake in accurate, informed, and fair adjudication of criminal proceedings. It is hardly a novel idea that assertions of privilege must give way to a specific need for evidence in a criminal case. See, e.g., United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). We conclude that the First Amendment does not require in every case a special showing of need and relevance beyond those imposed under discovery procedures when information in a criminal case is demanded from a reporter.[15]

III. Article I, Section 9 of the Indiana Constitution
Finally, the stations argue that compelled disclosure of outtakes without a special showing of need and relevance violates Article I, Section 9 of the Indiana Constitution. That section provides: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible." Relying on Price v. State, 622 N.E.2d 954 (Ind.1993), the stations contend, in the vernacular of Price, that gathering and disseminating information about criminal proceedings is a "core constitutional value" and that compelled disclosure of unaired video footage related to those events "materially burdens" this core value. Cline responds that Price is "irrelevant" to determining whether Section 9 recognizes a qualified reporter's privilege. It is not self-evident that the methodology of Price applies to the asserted privilege here, but we need not resolve that issue. Assuming without deciding that a "material burden" on newsgathering ability could establish a violation of the Indiana Constitution, or at least that the *16 information at stake is entitled to constitutional protection, we easily conclude that Cline's discovery demand does not rise to the level required to establish a Section 9 violation.
As noted in addressing the First Amendment argument, the stations remain free to publish or not to publish as they see fit, and to communicate with any source of information they see fit. There is no direct restraint on these activities and it is not reasonably apparent that requiring the press to comply with discovery requests has produced or will produce a chilling effect on the flow of information. The burden of going through archives or inventory in response to a subpoena will inevitably occupy time and energy that might otherwise be spent preparing and publishing news stories. However, the "distraction" argument is particularly unpersuasive in light of the stations' concession in their brief that Cline is entitled to copies of any relevant footage that was broadcast. The claim then is reduced to the inconvenience of also copying the outtakes. Irrespective of the particular facts here, we have been given no reason to believe that a discovery request by a criminal defendant that comports with the requirements of the Indiana Rules of Trial Procedure will amount to anything more than a slight imposition on the media, and no impairment at all of their ability to report the news. Abuses or claims of actual impairments of the flow of information can be dealt with on a case by case basis. Certainly this case presents no grounds for finding a constitutional violation.

Conclusion
The order of the trial court is vacated except insofar as WTHR and WRTV are directed to produce copies of any videotaped interviews of defendant Krista Cline, aired or unaired, for in camera inspection by the trial court. This cause is remanded for further proceedings consistent with this opinion.
SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.
NOTES
[1] Cline initially sought these materials by way of a motion for an ex parte order filed on July 11. On July 14, the trial court granted that motion and ordered WTHR and WRTV, who had no notice of the request, to turn over the materials to Cline by July 18. WTHR and WRTV moved to vacate the order and argued that the discovery request did not comply with the requirements of Indiana Rule of Trial Procedure 34(C). On July 22, the trial court vacated the ex parte order and directed Cline to comply with Rule 34(C) "in requesting videotape and any other materials from WRTV-6." The record discloses no similar ruling as to WTHR, but the parties appear to assume that the order was also vacated as to WTHR. Cline then served the subpoenas discussed above.
[2] The trial court's order did not include the findings required for discretionary interlocutory appeals by Indiana Appellate Rule 4(B)(6). State v. Hogan, 582 N.E.2d 824 (Ind.1991) settled that appeals from discovery orders are discretionary and therefore should be made pursuant to those findings. However, it is apparent from the record that the trial court found the dispute here to be of sufficient importance to warrant immediate appellate review. As noted, the court stayed enforcement of its order until the stations' appellate remedies could be exhausted. We address the appeal on the merits rather than remand for technical compliance with Rule 4(B)(6) because: (1) we agree that a substantial question of law is presented; (2) the parties agree that question is the validity of the trial court's order for in camera inspection and ask that it be resolved promptly; and (3) the stations' remedy by appeal after final judgment would be inadequate.
[3] Criminal Rule 21 was amended effective March 1, 1997 to provide that the Trial Rules are generally applicable to all criminal "proceedings," rather than merely to criminal "appeals" as the prior version provided. This cosmetic tinker intended to effect no substantive change in existing law. Rita, 674 N.E.2d at 970 n. 3. Some decisions before the recent amendment stated that discovery in criminal cases is governed by trial court discretion rather than the Trial Rules. Spears v. State, 272 Ind. 647, 403 N.E.2d 828 (1980); Hicks v. State, 544 N.E.2d 500 (Ind.1989) (citing Spears); State ex rel. Grammer v. Tippecanoe Circuit Court, 268 Ind. 650, 377 N.E.2d 1359 (1978); Royston v. State, 272 Ind. 292, 397 N.E.2d 285 (1979) (citing Grammer.) To the extent these or other cases suggest that the Trial Rules are per se inapplicable to criminal proceedings, they are superseded by the recent amendment. This does not imply that the result of any of these cases would be different under the Trial Rules. We also note that some Trial Rules are inapplicable by their terms to criminal proceedings. For example, Rule 56 governing summary judgment applies to persons "seeking to recover upon a claim." Ind. Trial Rule 56(A). Other Rules are presumably impractical of application in a criminal case. For example, Requests for Admission (Rule 36) or Interrogatories (Rule 33) may either be unnecessary in view of the criminal pretrial procedures, cf. Grammer, supra, or if directed to a defendant produce nothing but objections grounded on constitutional rights.
[4] This test originated in Dillard v. State, 257 Ind. 282, 274 N.E.2d 387 (1971), decided shortly after the Trial Rules came into force in 1970. The relevance and particularity requirements have not been amended since the Rules were enacted. Although most cases applying the Dillard test have involved discovery requests propounded to the State, the Dillard criteria have also been applied to discovery demands made to third parties in criminal cases. See, e.g., Jorgensen v. State, 574 N.E.2d 915 (Ind.1991).
[5] To the extent Cline seeks information to support a possible civil suit against a media organization, this provides no basis for discovery here. The discovery rules do not require disclosure of information for hypothetical cases not yet filed, except as specifically provided in Trial Rule 27, which imposes a number of requirements (verification, etc.) not met by Cline's subpoena here.
[6] Indeed, Cline does not appear on the whole to be seriously interested in anything beyond the interview itself. She maintains in her brief: "Cline is only seeking a videotape copy of the entire videotape of her interview, whether aired and unaired portions ("outtakes"), that was conducted outside the presence of her attorneys."
[7] We recognize that trial courts are asked to walk a tightrope with respect to in camera review. Convictions have been reversed where discovery was denied without conducting an in camera hearing to assess the validity of any objections to discovery. Hulett v. State, 552 N.E.2d 47 (Ind.Ct.App.1990) (defendant's motion to compel production of statements that alleged child molestation victim made to welfare department before the trial was denied without an in camera hearing); Sturgill v. State, 497 N.E.2d 1070 (Ind.Ct.App.1986) (same). See also Pigg v. State, 603 N.E.2d 154 (Ind.1992) (new trial was required because defendant was denied the opportunity to cross-examine witness as to his address; in camera hearing would have enabled trial court to assess relevance of the proposed questioning). This might support the conclusion that if there is any doubt on the point, in camera inspection should be undertaken. However, in each of the above decisions, the potential materiality of the disputed information was either self-evident or established. Federal courts have made the same distinction in reviewing the decision whether to conduct in camera review. Cf. United States v. Burke, 700 F.2d 70, 78 n. 9 (2d Cir.1983) ("We would have been troubled by the court's failure to undertake in camera review if there were any reasonable grounds to believe that inspection ... would yield any probative evidence....") (italics deleted).
[8] This case does not involve a reporter's notes or other records. Accordingly, today's decision voices no opinion on whether a privilege of any kind exists with respect to those materials.
[9] The stations contend that Indiana recognized a functional equivalent of the three-part test outlined above in In re Subpoena Duces Tecum to Stearns v. Zulka, 489 N.E.2d 146 (Ind.Ct.App. 1986). Zulka was limited to civil cases. Indeed, the Court of Appeals there regarded Branzburg v. Hayes, discussed above, as precluding a First Amendment-based privilege in criminal proceedings. Id. at 149-50.
[10] Three cases were consolidated for decision in BranzburgBranzburg v. Hayes, In re Pappas, and United States v. Caldwell. Branzburg and Caldwell primarily involved direct observation of criminal activity. The precise grand jury questions posed to the reporter in In re Pappas were unclear from the record, but the Court affirmed a summons in that case directing the reporter "to give such evidence as he knows relating to any matters which may inquired of...." Branzburg, 408 U.S. at 673, 709, 92 S.Ct. at 2652, 2670-71. Thus, even if Branzburg is "limited to its facts," as some courts have done, e.g., United States v. Sanusi, 813 F.Supp. 149 (E.D.N.Y.1992), we cannot conclude that the Court's holding applies only to cases in which the reporter directly observed a crime. Moreover, the decision does not seem to turn on the distinction, assuming one can be made, between "direct" and "indirect" knowledge of criminal activity.
[11] It is true that some federal circuits have interpreted Branzburg to have created a qualified reporter's privilege. See, e.g., Shoen v. Shoen, 5 F.3d 1289, 1292-93 (9th Cir.1993); United States v. Burke, 700 F.2d 70, 76-77 (2d Cir.1983); but see United States v. Cutler, 6 F.3d 67, 70-73 (2d Cir.1993) (describing Burke as dicta). Although Shoen asserted that "[e]ight of the other nine circuits that have decided the question read Branzburg the same way," Shoen, 5 F.3d at 1292 & n. 5 (collecting cases), examination of the decisions the Ninth Circuit cited for this proposition reveals less than meets the eye. For example, United States v. Cuthbertson, 630 F.2d 139 (3d Cir.1980) mentioned Branzburg in passing and appears to have based its holding primarily on federal common-law privilege under Federal Rule of Evidence 501. And Zerilli v. Smith, 656 F.2d 705 (D.C.Cir.1981), while holding that Branzburg was not controlling in the civil context, opined only in dicta on Branzburg's application to criminal proceedings. Some cases, without clearly addressing whether Branzburg decided the issue, held that the press in any event had legitimate First Amendment interests that could be asserted to deny discovery. United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir.1988) (where criminal defendant sought outtakes of interview of key government witness, trial court had to balance First Amendment interests against defendant's constitutional right to a fair trial, compulsory process, and confrontation). In short, the decisional law on the effect of Branzburg is far from uniform. Our conclusions on the point most closely resemble those expressed in In re Grand Jury Proceedings, 810 F.2d 580 (6th Cir.1987) and In re Grand Jury Subpoena ABC, Inc., 947 F.Supp. 1314 (E.D.Ark. 1996) (denying motion to quash subpoena for interview outtakes in investigation of "Whitewater" affair).
[12] See generally RODNEY A. SMOLLA, SMOLLA & NIMMER ON FREEDOM OF SPEECH: A TREATISE ON THE FIRST AMENDMENT § 13.03 (1994) (discussing Branzburg and how lower courts have applied it); Romualdo P. Eclavea, Annotation, Privilege of Newsgatherer Against Disclosure of Confidential Sources or Information, 99 A.L.R.3d 37 (1980 & Supp.1997).
[13] Justice Powell's comments in subsequent decisions about Branzburg (and particularly his concurrence in that case) are consistent with our reading of Branzburg. Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) rejected the claim that a warrant to search the offices of a newspaper could not be issued without a special showing of need for the information. Justice Powell cautioned in Zurcher that his Branzburg concurrence

does not support the view that the Fourth Amendment contains an implied exception for the press.... That opinion noted only that in considering a motion to quash a subpoena directed to a newsman, the court should balance the competing values of a free press and the societal interest in detecting and prosecuting crime. The concurrence expressed no doubt as to the applicability of the subpoena procedure to members of the press. Rather than advocating the creation of a special procedural exception for the press, it approved recognition of First Amendment concerns within the applicable procedure.
Id. at 570 n. 3, 98 S.Ct. at 1984 n. 3 (Powell, J., concurring). And in his dissent in Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), Justice Powell observed that Branzburg "considered the assertion by newsmen of a qualified First Amendment right to refuse to reveal their confidential sources or the information obtained from them to grand juries. The Court rejected this claim...." Id. at 858, 94 S.Ct. at 2818 (Powell, J., dissenting).
[14] The record in this case does not support any conclusion that access to the press is significantly deterred by the possibility of disclosure. To the extent the argument is that confidential sources those who speak with the expectation of confidentialitywill be revealed by compliance with a discovery request, it makes an assumption that is undocumented and appears to be unwarranted by recent history in Indiana. The General Assembly has provided that a reporter "shall not be compelled to disclose in any legal proceedings or elsewhere the source of any information," whether published or not. IND.CODE § 34-3-5-1 (1993). That statute has generally been enforced according to its terms. See, e.g., Shindler v. State, 166 Ind.App. 258, 335 N.E.2d 638 (1975).
[15] Indeed, other courts faced with similar objections to producing video outtakes held that the tapes had to be produced. See, e.g., United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir. 1988) (outtakes of interview that NBC conducted with key government witness had to be produced for in camera inspection).