946 N.E.2d 1221 (2011)
Lamar M. CRAWFORD, Appellant-Defendant,
v.
STATE of Indiana, Appellee-Plaintiff.
No. 49A05-1006-CR-377.
Court of Appeals of Indiana.
April 12, 2011.
*1223 Michael R. Fisher, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.
Gregory F. Zoeller, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellant-Defendant, Lamar M. Crawford (Crawford), appeals his conviction for murder, a felony, Ind.Code § 35-42-1-1.
We affirm.[1]

ISSUES
Crawford raises two issues on appeal, which we restate as follows:
(1) Whether the trial court abused its discretion when it quashed part of his request for production of documents to a non-party television production company; and
(2) Whether the State produced sufficient evidence to prove beyond a reasonable doubt that Crawford committed murder.

FACTS AND PROCEDURAL HISTORY
During April of 2009, Gernell Jackson (Jackson) lived on Medford Avenue in Indianapolis, Indiana. Jackson had a sister named Dorothy Crawford (Dorothy) and two nephews, Crawford and his brother, Naamonn Crawford (Naamonn). Naamonn was close to his uncle and visited him at his home a few days a week. Sometimes during these visits, Crawford also joined them. While Crawford visited his uncle periodically, they did not always get along. On two separate occasions, Jackson reported that his car had been stolen by Crawford. Each time, Jackson dropped the charges when he recovered his car. Crawford's cousin, Donald Hurd (Hurd), last saw Crawford at Jackson's house sometime between April 5 and 7, 2009. When Hurd last saw Crawford, he did not have any injuries to his face or hands.
On April 9, 2009, Naamonn visited Jackson and discovered him dead on the floor of his house, covered with a blanket. Naamonn immediately called 9-1-1 and attempted to perform CPR. When ambulance and police personnel arrived shortly after Naamonn's call, they pronounced Jackson dead on arrival as a result of forty separate stab and cut wounds all over his body. After an investigation of the scene, Indianapolis police officers determined that Jackson's car, a tan Chevy Impala, was missing, as well as Jackson's electronic JVC receiver. Detective John Breedlove also discovered blood stains in the bathroom and a box of Band-Aids in a back bedroom. The peel-off wrappers of *1224 the Band-Aids had been discarded on the dresser, and there was dried blood near the Band-Aid box.
That same day, Crawford called a former girlfriend, Kurina McCormick (McCormick), and told her he was coming to visit her. When he arrived, she saw that he was driving a tan Chevy Impala. McCormick asked Crawford where he had gotten the car, and he told her that "he bought it." (Transcript p. 324). McCormick also noticed that Crawford had bandages on his hand and fingers and scratches on his face.
Later that day, Crawford attempted to draw money from Jackson's bank account using Jackson's debit card. When that failed, he sold Jackson's electronic JVC receiver to a pawn shop and attempted to cash one of Jackson's checks at another bank. The bank teller determined that the signature on the check did not match Jackson's and refused to cash it. Afterwards, Crawford went to an Applebee's restaurant and a strip club. Naamonn attempted to contact Crawford three or four times that night after he discovered Jackson, but Crawford did not answer his phone.
The next day, April 10, 2009, Dorothy found McCormick's contact information and attempted to reach Crawford at McCormick's house. McCormick answered the phone, but hung up when Crawford told her that he did not want to talk to his mother. Subsequently, Dorothy called the police, and the police went to McCormick's apartment and apprehended Crawford.
During the investigation, the police discovered that Crawford's DNA matched blood stains on the drawers in the northwest bedroom of Jackson's house; on a washcloth recovered from the bathroom floor; on the northwest bedroom floor; on the bathroom sink; on a napkin recovered from the bathroom sink; on the driver's seat, dashboard, and steering wheel of Jackson's car; on a lighter; and on some coins. The police also discovered DNA from three different peopleCrawford, Jackson, and an unknown personon a wooden knife handle left at the scene.
On April 15, 2009, the State filed an Information charging Crawford with Count I, murder, a felony, I.C. § 35-42-1-1, and then added Count II, habitual offender, I.C. § 35-50-2-8, on June 4, 2009. Prior to trial, a television production company called "Lucky Shift, Inc." (Lucky Shift) filmed the course of Crawford's murder investigation and interviewed parties involved. It combined this footage into episode one of season two of a nonfiction police show called "The Shift," which aired on September 30, 2009. Crawford served a request for production of documents by a non-party on Lucky Shift, seeking "any and all recorded footage, both aired and unaired, relating to the investigation by the Indianapolis Metropolitan Police Department ... which resulted in charges against Lamar Crawford." (Appellant's App. p. 226). Lucky Shift objected, and the trial court sustained the objection on the grounds that the request was not sufficiently particular. As a result, Crawford amended his request for production on Lucky Shift and made twenty new or amended requests. Lucky Shift again objected, and the trial court granted thirteen of the amended requests and denied seven. The trial court denied three requests because they lacked particularity and four requests because Lucky Shift claimed that the requested footage did not exist.
Then, from May 11-13, 2010, a three-day jury trial was held. At trial, Crawford alleged that a neighbor named Michael Craig (Craig) was responsible for Jackson's murder. According to Crawford, he *1225 was visiting his uncle when a man wearing black clothes and a ski mask came into his uncle's house through the door. That man attacked Jackson and injured Crawford as Crawford tried to defend his uncle. Before leaving, the man warned Crawford that he would kill him if he did anything and that he knew where Crawford's family lived. Crawford did not see the man's face, but he argued that the man was Craig, because the police had found multiple threatening messages from Craig on Jackson's voicemail during their investigation. In further support of his version of events, Crawford noted the unknown DNA that the police found on the knife handle.
At the close of evidence, the jury found Crawford guilty as charged. Then, on May 27, 2010, the trial court sentenced Crawford to an aggregate sentence of 85 years. In its order of judgment of conviction, the trial court noted as aggravating circumstances: (1) Crawford's prior criminal history, both as a juvenile and as an adult; (2) repeat offenses; (3) the nature and circumstances of the crime committed; and (4) Crawford's conduct after the offense.
Crawford now appeals. Additional facts will be provided as necessary.

DISCUSSION

I. Request for Production of Documents

Crawford first contends that the trial court abused its discretion when it quashed three of his requests for production of documents from Lucky Shift. The three requests that Crawford disputes are as follows:
e. Request # 18: Footage of any and all statements of officers, agents, or affiliates of [the Indianapolis Metropolitan Police Department] or any reenactment thereof. [Lucky Shift's] objection sustained.
f. Request # 19: Footage of anyone interviewed or questioned, or any reenactment thereof, in connection with the investigation of the death of Gernell Jackson. [Lucky Shift's] objection sustained.
g. Request # 20: Any and all recorded footage, both aired and unaired, relating to the investigation by the Indianapolis Metropolitan Police Department of a murder that is the subject of Season Two, Episode One, of the Shift, an Investigation Discovery Program, which aired on September 30, 2009. [Lucky Shift's] objection sustained.
(Appellant's Br. p. 8).
On appeal, we recognize that a trial court has broad discretion to control discovery, and we will only review a trial court's rulings on discovery issues for an abuse of discretion. Stuff v. Simmons, 838 N.E.2d 1096, 1099 (Ind.Ct.App.2005). An abuse of discretion occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or when the trial court has misinterpreted the law. Id. Due to the fact-sensitive nature of discovery matters, the ruling of a trial court is cloaked in a strong presumption of correctness on appeal. Williams v. State, 819 N.E.2d 381, 384 (Ind.Ct.App.2004).
Here, the issue turns on Crawford's request for discovery from a non-party, Lucky Shift. The question of whether a defendant may obtain discovery from a non-party is governed by the Indiana Trial Rules, which have in turn been interpreted by case law. Indiana Trial Rule 26(B)(1) provides that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense *1226 of any other party...." A trial court may restrict discovery, though, to protect a party from annoyance, embarrassment, oppression or undue burden of expense. Ind. T.R. 26(C).
In interpreting these provisions, the Supreme Court of Indiana has determined that the Trial Rules presumptively entitle a defendant to discover any evidence from any party or non-party that assists in the preparation of his or her defense. WTHR-TV v. Milam, 690 N.E.2d 1174, 1176 (Ind.1998). To do so, a defendant must make two showings: (1) sufficient designation of the items sought, or particularity; and (2) materiality. Then, if the particularity and materiality requirements are met, the trial court must grant the request unless there is a showing of "paramount interest" in non-disclosure. In re WTHR-TV, 693 N.E.2d 1, 6 (Ind.1998) (Cline).
A request is reasonably particular if it enables the subpoenaed party to identify what is sought and allows the trial court to determine whether there has been sufficient compliance with the request. Williams, 819 N.E.2d at 385. This determination will depend on "the facts of each individual case, the crime charged, the nature of the items sought to be discovered, the degree of discovery of other items of information, [and] the nature of the defense...." Cline, 693 N.E.2d at 6-7 (quoting Dillard v. State, 257 Ind. 282, 274 N.E.2d 387, 392 (1971)). In turn, evidence is material if it might reasonably affect the outcome of the trial. Id. Where the materiality of information is not self-evident or is unknown, the defendant must indicate its potential materiality to the best of his ability. Milam, 690 N.E.2d at 1176. Under such circumstances, a consideration of potential materiality also incorporates an evaluation of the availability of the information from other sources, the difficulty of compliance, and some plausible showing as to what information the respondent has and why there is a need to demand the information. Cline, 693 N.E.2d at 7.
Finally, whether an opposing party or non-party's interest is sufficient to prevent discovery "`will depend upon the type of interest put forth' and `the category of information sought.'" Id. (quoting Dillard, 274 N.E.2d at 392). Inconvenience may be a sufficient interest in resisting discovery if the need for discovery from that source is minimal"for example, because it is readily available elsewhere without need to drag third parties into court." Id. Ultimately, the test for discoverable material in a criminal proceeding involves a balancing of the relevance of the material, its availability from other sources, the burden of compliance measured in terms of difficulty, and the nature and importance of the interests invaded. Williams, 819 N.E.2d at 385.
Here, Crawford argues that the trial court should not have quashed his discovery requests because each of the requests was sufficiently particular and material, and Lucky Shift did not have a paramount interest in non-disclosure. We cannot agree with Crawford because his requests lacked particularity. This court and our supreme court have previously addressed the standards for sufficient designation in Cline, Milam, Dillard and Williams, all of which are relevant here.
In Cline, sixteen-year-old Krista M. Cline (Krista) was charged with the murder of her daughter. Cline, 693 N.E.2d at 4. At some point after a public defender was appointed to represent her, one or more Indianapolis television stations conducted a videotaped interview of her without the public defender's knowledge or consent. Id. In the following criminal action, Krista requested:

*1227 [v]ideotape[d] copies of all news footage and tapes (which have not been previously destroyed or reused), aired and unaired, edited and unedited, regarding the death of [Cline's] daughter, Alexis Cline, and regarding the questioning, apprehension, arrest and court appearances of Krista Cline or any other individuals who may have knowledge of this matter.
Id. WTHR and WRTV resisted production of any outtakes without judicial review and asserted a constitutional "reporter's privilege" against compulsory disclosure. Id.
On appeal, the Indiana Supreme Court determined that Krista had met the particularity test in regards to the videotaped interview because the videotape was clearly identifiable and could be used either offensively or defensively by the State in Krista's trial. Id. at 9. In contrast, though, the supreme court vacated the rest of the trial court's order, which had required production of the rest of the requested footage for in camera review, because it determined that Krista had not sufficiently designated the rest of the footage. Id. at 16. In making this determination, the Cline court specified that it is important that a party making a request is not "engaged in a fishing expedition with no focused idea of the size, species, or edibility of the fish." Id. at 7.
The same day it published Cline, the Indiana Supreme Court stated in Milam that a defendant must show "something more precise than `give me everything related to the case.'" Milam, 690 N.E.2d at 1176. The discovery requests and arguments in Milam are very similar to those in Cline. In Milam, Zelda R. Milam (Milam) was charged with the murder of her husband. Id. at 1175. Milam's attorney requested an order from the trial court directing WTHR to produce:
all news footage, aired and [un]aired, edited and unedited, regarding the death of Billie Milam, W/M, on January 1, 1997, and regarding the questioning, apprehension, arrest and arraignment of Zelda Ruby `Kay' Milam or any other individuals who may have knowledge of this matter.
Id. WTHR contended that a constitutional "reporter's privilege" precluded compulsory disclosure of unaired footage, but the trial court ordered in camera review of the footage. Id. On appeal, the supreme court determined that Milam's request was not sufficiently particular. Id. at 1176.
The Indiana Supreme Court also addressed the standard for sufficient designation in Dillard. In Dillard, the defendant requested "a copy of any and all inter-office memo, notes, reports ... of and concerning the robberies, the investigation of defendant herein and any and all persons suspected, interrogated and detained in connection therewith." Id. at 290. The supreme court rejected this request as an "impermissible fishing expedition or an attempted rummaging about in the police files hoping to turn up something to use at the trial." Id. at 292.
Unlike the Indiana Supreme Court's opinions in Cline, Milam, and Dillard, this court found the defendant's discovery request sufficiently particular in Williams. In Williams, the State charged Jeffrey Williams (Williams) with four counts of criminal deviate conduct and rape. Williams, 819 N.E.2d at 384. K.W.M., the victim of his attack, informed the police that she was on medication to help her sleep the night of the attack and was disoriented as a result. Id. At trial, Williams filed a motion for specific discovery seeking: (1) business records from a particular Walgreens indicating any prescriptions filled by K.W.M. in the past three years; (2) mental health records, both created *1228 and gathered from other health care institutions; and (3) records generated in a CHINS actions involving K.W.M. and Williams. Id. In defense of his request for business records from Walgreens, Williams alleged that K.W.M. was addicted to pain medications and was off of her prescription medication on the night in question, which could affect her credibility. Id. On appeal, we held that the request was sufficiently particular, noting that the request specified one identifiable Walgreens and narrowly applied to a three year timeframe. Id. at 386.
Here, the State argues that Crawford's requests amount to fishing expeditions, as proscribed by both Cline and Milam. According to the State, Crawford's requests were overly broad in that he effectively asked for everything. We agree with the State's arguments, because the language of Crawford's requests bears a closer resemblance to the insufficient language of the requests in Cline, Milam, and Dillard, than the sufficiently particular requests for the videotaped interview in Cline and for business records from Walgreens in Williams.
Crawford's Request # 20 asks for "[a]ny and all recorded footage, both aired and unaired, relating to the investigation...." (Appellant's Br. p. 8). This language is almost identical to the request in Cline asking for "all news footage and tapes (which have not been previously destroyed or reused), aired and unaired, edited and unedited, regarding the death of [Cline's] daughter." Cline, 693 N.E.2d at 4. Similarly, it is almost identical to the request in Milam for "all news footage, aired and [un]aired, edited and unedited, regarding the death of Billie Milam." Milam, 690 N.E.2d at 1175. Accordingly, as in Cline and Milam, the language of Crawford's Request # 20 is not sufficiently particular here.
Crawford's Request # 18 and Request #19 are slightly narrower than Request # 20, but they still lack particularity, especially when compared with the videotaped interview in Cline and the Walgreens request in Williams. The requests in Cline and Williams were sufficiently particular because they had a narrow and measurable scope. In spite of vacating the trial court's order requiring production in Cline, the supreme court allowed production of the videotaped interview because it was a very specific and identifiable item. Similarly, in Williams we noted that Williams' request was sufficient because Williams identified a specific Walgreens and narrowed the time frame of production to three years. Here, Crawford asks for "all statements of officers, agents, or affiliates of the Indianapolis Metropolitan Police Department ..." in Request # 18 and "[f]ootage of anyone interviewed or questioned, or any reenactment thereof ..." in Request #19. (Appellant's Br. p. 8). Both of these requests have a potentially broad scope with respect to the number of people and the time period involved. The requests are especially broad in comparison to the thirteen requests made by Crawford that the trial court granted, such as Request # 3, "statements made to and from Dr. Clouse." (Appellant's App. p. 296). Accordingly, the trial court did not abuse its discretion in quashing these requests.

II. Sufficiency of the Evidence

Next, Crawford argues that the State did not present sufficient evidence to prove beyond a reasonable doubt that he committed murder. In reviewing a sufficiency of the evidence claim, this court does not reweigh evidence or judge the credibility of witnesses. Perez v. State, 872 N.E.2d 208, 213 (Ind.Ct.App.2007), trans. denied. In addition, we only consider the evidence most favorable to the verdict *1229 and the reasonable inferences stemming from that evidence. Id. We will only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. Id. at 212-13.
In order to convict Crawford for murder, the State was required to prove beyond a reasonable doubt that Crawford "knowingly or intentionally kill[ed] another human being." I.C. § 35-42-1-1. Crawford argues here that although "circumstantial evidence, including DNA evidence as well as his use of the victim's property after the incident, connects him to the crime, the evidence does not refute [his] version of how the killing took place." (Appellant's Br. p. 13). Instead, his injuries and his DNA at the crime scene support his claim that he tried to defend Jackson from an attack by an unknown intruder.
First, it is important to note that intent is a mental function that, absent a confession, may be proven by circumstantial evidence. Mason v. State, 944 N.E.2d 68, 72-73 (Ind.Ct.App.2011). As Crawford admits, there was a plethora of circumstantial evidence concerning his participation in Jackson's murder. His DNA was discovered in bloodstains throughout the house and on the knife handle found at the scene, he had cuts on his face, he took his uncle's car, he attempted to use his uncle's debit card, and he pawned his uncle's electronic JVC receiver. When we interpret this evidence in the light most favorable to the trial court, it is sufficient to prove that Crawford had the intent to kill Jackson.
More specifically, though, Crawford argues that the evidence is also compatible with the theory that he defended Jackson. He notes that his DNA was not under Jackson's fingernails, even though "[o]ne would expect that [Crawford's] DNA would be found under [Jackson's] fingernails, if indeed it was [Jackson] rather than the intruder who scratched his face." (Appellant's Br. p. 16). Also, "the DNA of some unknown person was found on the wooden knife handle ... and some latent fingerprints recovered from the house were identifiable but did not match Mr. Crawford or [Jackson]." (Appellant's Br. p. 16). We cannot consider these assertions because to do so would be to reweigh the evidence presented to the jury. The jury was presented with this evidence at trial and chose to believe the State's version of events rather than Crawford's version. As stated above, it is not our place to reweigh the evidence or judge the credibility of witnesses. Perez, 872 N.E.2d at 213. Therefore, we conclude that the State presented sufficient evidence to prove beyond a reasonable doubt that Crawford committed murder.

CONCLUSION
Based on the foregoing, we conclude that (1) the trial court did not abuse its discretion when it quashed part of Crawford's request for production of documents to a non-party television production company, and (2) the State produced sufficient evidence to prove beyond a reasonable doubt that Crawford committed murder.
Affirmed.
ROBB, C.J., and KIRSCH, J., concur.
NOTES
[1] We held an oral argument in this case on February 24, 2011, at Wabash College in Crawfordsville, Indiana. We thank Wabash College for its hospitality in hosting the argument and counsel for their excellent advocacy.