## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 14 2016, 9:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kathleen Clearly
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lamar Crawford,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

September 14, 2016

Court of Appeals Case No.
49A05-1603-PC-573

Appeal from the Marion Superior Court

The Honorable Sheila A. Carlisle, Judge

The Honorable Stanley E. Kroh, Magistrate

Trial Court Cause No.
49G03-0904-PC-39093

**Crone, Judge.**

# Case Summary

A jury convicted Lamar Crawford of murder and found him to be a habitual offender. The trial court sentenced him to an aggregate term of eighty-five years, and his conviction was affirmed on direct appeal. Crawford filed a petition for postconviction relief ("PCR"), claiming ineffective assistance of counsel, and now appeals the postconviction court's denial of his petition. Finding that he has failed to meet his burden of establishing ineffective assistance of counsel, we affirm.

# Facts and Procedural History

The relevant facts as summarized by another panel of this Court in Crawford's direct appeal read in pertinent part as follows:

> During April of 2009, Gernell Jackson (Jackson) lived on Medford Avenue in Indianapolis, Indiana. Jackson had a sister named Dorothy Crawford (Dorothy) and two nephews, Crawford and his brother, Naamonn Crawford (Naamonn). Naamonn was close to his uncle and visited him at his home a few days a week. Sometimes during these visits, Crawford also joined them. While Crawford visited his uncle periodically, they did not always get along. On two separate occasions, Jackson reported that his car had been stolen by Crawford. Each time, Jackson dropped the charges when he recovered his car. Crawford's cousin, Donald Hurd (Hurd), last saw Crawford at Jackson's house sometime between April 5 and 7, 2009. When Hurd last saw Crawford, he did not have any injuries to his face or hands.
>
> On April 9, 2009, Naamonn visited Jackson and discovered him dead on the floor of his house, covered with a blanket. Naamonn

immediately called 9-1-1 and attempted to perform CPR. When ambulance and police personnel arrived shortly after Naamonn's call, they pronounced Jackson dead on arrival as a result of forty separate stab and cut wounds all over his body. After an investigation of the scene, Indianapolis police officers determined that Jackson's car, a tan Chevy Impala, was missing, as well as Jackson's electronic JVC receiver. Detective John Breedlove also discovered blood stains in the bathroom and a box of Band-Aids in a back bedroom. The peel-off wrappers of the Band-Aids had been discarded on the dresser, and there was dried blood near the Band-Aid box.

That same day, Crawford called a former girlfriend, Kurina McCormick (McCormick), and told her he was coming to visit her. When he arrived, she saw that he was driving a tan Chevy Impala. McCormick asked Crawford where he had gotten the car, and he told her that "he bought it." McCormick also noticed that Crawford had bandages on his hand and fingers and scratches on his face.

Later that day, Crawford attempted to draw money from Jackson's bank account using Jackson's debit card. When that failed, he sold Jackson's electronic JVC receiver to a pawn shop and attempted to cash one of Jackson's checks at another bank. The bank teller determined that the signature on the check did not match Jackson's and refused to cash it. Afterwards, Crawford went to an Applebee's restaurant and a strip club. Naamonn attempted to contact Crawford three or four times that night after he discovered Jackson, but Crawford did not answer his phone.

The next day, April 10, 2009, Dorothy found McCormick's contact information and attempted to reach Crawford at McCormick's house. McCormick answered the phone, but hung up when Crawford told her that he did not want to talk to his mother. Subsequently, Dorothy called the police, and the police went to McCormick's apartment and apprehended Crawford.

During the investigation, the police discovered that Crawford's DNA matched blood stains on the drawers in the northwest bedroom of Jackson's house; on a washcloth recovered from the bathroom floor; on the northwest bedroom floor; on the bathroom sink; on a napkin recovered from the bathroom sink; on the driver's seat, dashboard, and steering wheel of Jackson's car; on a lighter; and on some coins. The police also discovered DNA from three different people—Crawford, Jackson, and an unknown person—on a wooden knife handle left at the scene.

On April 15, 2009, the State filed an Information charging Crawford with Count I, murder, a felony, I.C. § 35-42-1-1, and then added Count II, habitual offender, I.C. § 35-50-2-8, on June 4, 2009.

….

[F]rom May 11-13, 2010, a three-day jury trial was held. At trial, Crawford alleged that a neighbor named Michael Craig (Craig) was responsible for Jackson's murder. According to Crawford, he was visiting his uncle when a man wearing black clothes and a ski mask came into his uncle's house through the door. That man attacked Jackson and injured Crawford as Crawford tried to defend his uncle. Before leaving, the man warned Crawford that he would kill him if he did anything and that he knew where Crawford's family lived. Crawford did not see the man's face, but he argued that the man was Craig, because the police had found multiple threatening messages from Craig on Jackson's voicemail during their investigation. In further support of his version of events, Crawford noted the unknown DNA that the police found on the knife handle.

At the close of evidence, the jury found Crawford guilty as charged. Then, on May 27, 2010, the trial court sentenced Crawford to an aggregate sentence of 85 years. In its order of judgment of conviction, the trial court noted as aggravating

circumstances: (1) Crawford's prior criminal history, both as a juvenile and as an adult; (2) repeat offenses; (3) the nature and circumstances of the crime committed; and (4) Crawford's conduct after the offense.

*Crawford v. State*, 946 N.E.2d 1221, 1223-25 (Ind. Ct. App. 2011), *trans. granted*.

[3] Crawford appealed his conviction, which was affirmed by another panel of this Court. He sought transfer to the Indiana Supreme Court, challenging only the trial court's grant of the State's motion to quash certain nonparty subpoenas.[1] Finding that Crawford had not made his requests for subpoenas with sufficient particularity, our supreme court affirmed. *Crawford v. State*, 948 N.E.2d 1165, 1169 (Ind. 2011).

[4] In March 2012, Crawford filed a pro se PCR petition. In August 2014, by counsel, he filed an amended petition, claiming ineffective assistance of counsel based on trial counsel's ("Counsel's") alleged "failure to investigate and present evidence of intellectual and development disability" and "failure to object to disparaging prosecutorial arguments." Appellant's App. 84-85. The postconviction court held an evidentiary hearing and ordered the parties to submit proposed findings of fact and conclusions of law. In February 2016, the postconviction court issued its findings of fact and conclusions of law in an order denying Crawford's petition.

---

[1] In its opinion on transfer, our supreme court addressed only the issue of whether the trial court erred in quashing certain subpoenas, summarily affirming this Court on the sufficiency of evidence. *Crawford v. State*, 948 N.E.2d 1165, 1169 (Ind. 2011).

Crawford now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

Crawford contends that the postconviction court erred in denying his PCR petition. The petitioner in a postconviction proceeding "bears the burden of establishing grounds for relief by a preponderance of the evidence." Ind. Postconviction Rule 1(5); *Passwater v. State*, 989 N.E.2d 766, 770 (Ind. 2013). When issuing its decision to grant or deny relief, the postconviction court must make findings of fact and conclusions of law. Ind. Postconviction Rule 1(6). A petitioner who appeals the denial of his postconviction petition faces a rigorous standard of review. *Massey v. State*, 955 N.E.2d 247, 253 (Ind. 2011). In conducting our review, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the judgment. *McKnight v. State*, 1 N.E.3d 193, 199 (Ind. Ct. App. 2013). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Passwater*, 989 N.E.2d at 770 (citation and quotation marks omitted). In other words, if a postconviction petitioner was denied relief in the proceedings below, he must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite the one reached by the postconviction court. *Massey*, 955 N.E.2d at 253. Postconviction relief does not offer the petitioner a super appeal; rather, subsequent collateral challenges must be based on grounds enumerated in the

postconviction rules. *McKnight*, 1 N.E.3d at 199. These rules limit the scope of relief to issues unknown or unavailable to the petitioner on direct appeal. *Id*.

[7] Crawford maintains that he was denied his constitutional right to effective assistance of trial counsel. To prevail on an ineffective assistance claim, Crawford must satisfy two components: he must demonstrate both deficient performance and prejudice resulting from it. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is "representation [that] fell below an objective standard of reasonableness, [where] counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment." *Passwater*, 989 N.E.2d at 770. We assess counsel's performance based on facts that are known at the time and not through hindsight. *Shanabarger v. State*, 846 N.E.2d 702, 709 (Ind. Ct. App. 2006), *trans. denied*. Evidence of isolated poor strategy, inexperience, or bad tactics will not support an ineffective assistance claim; instead, we evaluate counsel's performance as a whole. *Flanders v. State*, 955 N.E.2d 732, 739 (Ind. Ct. App. 2011), *trans. denied* (2012). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Ritchie v. State*, 875 N.E.2d 706, 714 (Ind. 2007). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Hinesley*, 999 N.E.2d at 983.

[8] In his amended PCR petition, Crawford raised several allegations of deficient performance by Counsel. In this appeal, the allegations against Counsel are limited to (1) failure to properly investigate and present evidence regarding

Crawford's intellectual and developmental disabilities; and (2) failure to object to disparaging statements during the State's closing arguments. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Because *Strickland*'s prejudice prong necessitates a showing of a reasonable probability that counsel's deficient performance affected the outcome of the trial, establishing ineffective assistance of counsel based on counsel's failure to investigate "requires going beyond the trial record to show what investigation, if undertaken, would have produced." *McKnight*, 1 N.E.3d at 201.

[9]     Here, Counsel had over a decade of criminal defense experience in major felony cases. She was familiar with Crawford and petitioned the trial court for a psychiatric evaluation as well as a competency and sanity evaluation. The former was performed by Dr. Phillip Coons, who found in pertinent part with respect to Crawford's "Mental Status Examination,"

> He was oriented to person, place, and time. He recalled three out of three objects at five minutes. He knew the current president and past president but not the governor or vice president. He could not do simple calculations. His intelligence appeared borderline by the use of vocabulary. Insight and judgment were good.

Petitioner's Ex. 6.

[10]    The latter was performed by Dr. George F. Parker, associate professor of clinical psychiatry at the Indiana University School of Medicine. Dr. Parker found in pertinent part,

The defendant's thought process was concrete and organized throughout the interview. He answered questions appropriately. He denied ever experiencing auditory or visual hallucinations.

On cognitive evaluation, Mr. Crawford was oriented to person, place and time. His short-term memory was tested using four-word recall; he registered all four words immediately and recalled two of the words after a delay of a few minutes. He also recalled two new words, though they were related to the original words. The defendant's insight into his current legal situation was estimated to be adequate. His insight into his clinical status was estimated to be fair. His intelligence was clinically estimated to be in the range of normal.

. . . .

The defendant reported a history of treatment with antipsychotic medication, but said this medication was prescribed for depression and to keep him 'relaxed and calm" while he was in 23-hour lockdown for two years. Based on his report, it was difficult to determine if Mr. Crawford suffered from a true depression, from symptoms of psychosis, or both, while in administrative segregation. Mr. Crawford denied any history of experiencing auditory or visual hallucinations, did not appear to have a history of significant delusional beliefs, and presented with a fairly organized thought process during the clinical interview. Despite his report that his mother had wanted him to be evaluated because "people were saying I was crazy," there was little solid evidence to merit a diagnosis of a chronic psychotic disorder.

. . . .

Mr. Crawford said he had met with his attorney, but did not always understand what she told him, because of "some words she uses." He thought his attorney would be able to explain these words to him, if he asked her to do so. Based on the course

of the clinical interview, during which the defendant demonstrated a concrete and organized thought process and answered questions appropriately, he was estimated to have an adequate ability to work with his attorney, to disclose pertinent facts to his attorney, to testify relevantly and to comprehend legal advice or instruction.

Mr. Crawford understood how to appropriately challenge witnesses, as he was aware that witnesses were meant to "tell what they saw" and to "tell the truth" when in court. He said he would "tell my lawyer" if he thought a witness was not telling the truth. There was no evidence of any self-defeating attitude during the clinical interview. The risk of unmanageable behavior by the defendant in the courtroom was estimated to be low. His ability to tolerate the stress of a trial was estimated to be adequate.

….

OPINION: It is my opinion, with reasonable medical certainty, that the defendant does not have a mental disorder.

It is my opinion, with reasonable medical certainty, that the defendant is currently capable of understanding the nature and objectives of the legal proceedings against him.

It is my opinion, with reasonable medical certainty, that the defendant was not mentally ill at the time of the alleged offense. It is further my opinion, with reasonable medical certainty, that the defendant did appreciate the wrongfulness of his actions at the time of the alleged offense.

Petitioner's Ex. 7.

Crawford essentially argues that the doctors' reports were not sufficiently in-depth to show the extent of his intellectual deficiency and that Counsel therefore should have obtained and introduced his school records. Those records, dated 1995 and 1996, showed the thirteen/fourteen-year-old Crawford to have a "mild mental handicap," a verbal IQ of 62, a performance IQ of 77, and a full-scale IQ of 68. Petitioner's Ex. 5. The school psychologist summarized his findings in pertinent part,

> [Crawford] scored within the Mentally Deficient range of intelligence. There was significant difference between his verbal and performance intelligence. He scored within the Mentally Deficient range in his ability to determine general word knowledge and verbal concept formation.
>
> [Crawford's] achievement tests indicate that his achievement ability is within the mentally deficient range of achievement …. [H]e is mentally deficient in his numeral ability, reading ability and spelling ability. [Crawford] has problems with multiplication, division and fractions. [Crawford's] academic achievement in reading, spelling and math is commensurate in relation to intellectual level.

*Id.*

With respect to Crawford's intellectual deficiency, Counsel testified at the PCR hearing in pertinent part,

> A. I[t] … was noted in those high school reports that his IQ was a lot lower than I thought it was.
> Now, the doctors had already said he was borderline. And I think he had told me that he was in special ed[ucation] and had not finished high school. But I don't think I realized to what

extent the … I did not realize.
*And speaking with him, it didn't strike me either.* I didn't realize his scores were so low.

Q. Okay. Do you think that his intellectual disability would have been a part of the defense guilt phase?
A. *Guilt phase, no. He had given a statement to the detective and had actually, in my mind, handled himself very well.*
And my biggest fear during the case was that the State would not introduce his statement because I couldn't have had they not. And when they did, and I—and it—*his explanation at the time was the best. And there was really no place in there to argue that somehow he was not behaving normally or—because of an intellectual deficiency.*
It was more that he experienced a traumatic event and he was spinning out of control. And that's what he told the detective. And I—I thought that made the most sense.

Q. Regarding sentencing, do you think this information should have been revealed and put forth to the Court?

A. I think it might have helped to emphasize—it was—again, it was—it was noted in his PSI that he was in special classes, but it did not note that he had a low IQ.
The doctors—one of the doctors, at least, I recall said that he was borderline. But, again, the numbers were not here. It might have helped to illustrate it.
I don't know what the Court would have done. I'll defer to the Court on whether or not it might have made a difference for him.

Q. Did—and are you currently aware of U.S. jurisprudence which—U.S. Supreme Court jurisprudence cases where intellectual disability does relate to sentencing?

A.  Oh, yes.  It is a mitigator.[2]  *But it tends to be a better mitigator when it—it has a nexus between the defense and the actions.  And … I did not think it played into his behavior and how we were trying to present his behavior to the jury.*

PCR Tr. at 20-23 (emphases added).

[13]  As a whole, the evidence presented at the PCR hearing reveals that at the time of trial, the doctors' reports had shown Crawford to be lucid and organized in his thoughts, yet borderline deficient intellectually.  Although Crawford's school records, and specifically his IQ scores, might have shed additional light on the extent of his intellectual deficiency, Counsel's testimony indicates that the scores would not have played a role in the determination of guilt due to the nature of his defense (identity—that he was not the perpetrator) and that any mitigating potential concerning his sentence would have been buffered by the absence of a nexus between his intellectual deficiency, his actions, and his defense.  We also note the overwhelming aggravating circumstances in the form of Crawford's extensive criminal record, the heinous and violent nature of his offense, and the rapidity with which he acted after murdering his uncle, in stealing his uncle's car, pawning his uncle's stereo receiver, and attempting to cash checks and withdraw funds from his uncle's bank account.  Simply put, Crawford has failed to demonstrate that but for Counsel's failure to investigate and introduce his academic records, there is a reasonable probability that the

---

[2]  *McCarty v. State*, 802 N.E.2d 959, 967-68 (Ind. Ct. App. 2004) (citing *Atkins v. Virginia*, 536 U.S. 304, 306 (2002)), *trans. denied*.

result of the proceedings would have been different. As such, he has failed to meet his burden of establishing prejudice.

[14] Crawford also submits that Counsel was ineffective in failing to object to the prosecutor's allegedly inflammatory statements during closing argument. To prevail on a claim of ineffective assistance for failing to object, the defendant must show that an objection would have been sustained if made. *Overstreet v. State*, 877 N.E.2d 144, 155 (Ind. 2007), *cert. denied* (2008). With respect to a prosecutor's assault on a defendant's veracity, we note that "[a] prosecutor does not necessarily engage in misconduct by characterizing a defendant as a liar." *Cooper v. State*, 854 N.E.2d 831, 836 (Ind. 2006). Rather, "a prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence." *Id*. (citation omitted). Moreover, "[p]rosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Id*. In other words, a prosecutor's statements concerning the defendant's veracity must be placed in context with the evidence presented and arguments raised during the trial. For example, even if an objection likely would have been sustained if made, trial counsel may have declined to object as a strategy to avoid bringing unnecessary attention to a certain matter. *Id*.

[15] Here, the challenged statements center around two general themes: (1) challenges to Crawford's veracity, *see*, *e.g.*, Tr. at 831-32, 838 (referencing Crawford's version of events as "ridiculous" and an "impossible story" and directing jurors to "look at his lies," and "look at some of his other lies"); and

(2) disparagement of the defense, *see*, *e.g.*, *id*. at 840-42 (referencing defense's strategy as "Throw something on the wall and hope it sticks," "pointing fingers," and "hiding the ball" and stating, "We provided them with their defense.").

[16] With respect to the challenges to Crawford's veracity, we note that the PCR transcript is devoid of testimony concerning the prosecutor's references to Crawford's "lies" or his "ridiculous" and "impossible stories." *See* PCR Tr. at 16 (when asked whether she had concerns about arguments made during the State's closing argument, Counsel pointed only to "one argument in particular that just struck me at the time as being so wrong," which was the prosecutor's statement about having provided Crawford with his defense). Because Crawford failed to raise Counsel's failure to object to the prosecutor's accusations of lying during the PCR proceedings below, he has waived them for consideration on appeal. *See Koons v. State*, 771 N.E.2d 685, 691-92 (Ind. Ct. App. 2002) (petitioner who fails to raise issue before PCR court below waives argument on appeal), *trans. denied*. Even so, we note that Crawford's defense was based on his assertion that he was not the perpetrator but instead was attempting to intervene on behalf of the stabbing victim. As such, his credibility was the linchpin of his defense, and while we believe the better practice is for attorneys to avoid such denigrating terms as "liar" and "lying" during closing argument, Crawford placed credibility in issue, and we do not believe that the absence of an objection to the State's use of the terms amounted to deficient performance by Counsel.

[17]    As previously noted, the evidence adduced at the PCR hearing focused almost entirely on one specific comment by the prosecutor, "We provided them with their defense." Tr. at 841. Counsel testified in pertinent part with respect to this statement:

> A. There was one argument in particular that just struck me at the time as being so wrong, but *I did not object. And it took me honestly—embarrassment, but it took me probably a year or two or more to break it down and figure out what was so wrong about the comments that were made.*
>
> ….
>
> What was stated by the State was—now, this was in regards to the—the telephone calls on the [victim's] answering machine and the information about Michael Craig that came in way late in the case.
> And the statement was, [w]e provided them with their defense.
> And what was so wrong about that statement was *Brady*[3] requires that the State turn over potentially exculpatory evidence. That is the State's responsibility. *But it didn't strike me at the time.*
> *It is true that they gave us information that became a defense.* But for the State to turn it around and flip it as if they had given us a gift or they—they had been gracious when it is absolutely constitutionally required, and certainly after they had delayed, they had no excuse for that, for them to take that set of facts and make it seem as though we hadn't done any work on the

---

[3] The *Brady* rule requires the State to disclose material exculpatory evidence to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

case, it belittled the defense.

*… [I]t took me, again, I apologize, years later to break this all down mentally.*

….

I did not make an objection.

Q. Do you feel you should have?

A. I think if I had been a smarter lawyer, I should have, absolutely. If I could have articulated and—what I can now. But I was stunned. I felt it gutted our case. I felt it gutted our defense. *I was sick when I heard those comments. But I could not break it down and really analyze to what it—to how—how pervasive and penetrating in a negative, devastating way those comments were to the entire process of gathering evidence* and *turning it over* as contemplated by *Brady*.

PCR Tr. at 16-20 (emphases added).

[18]  As the PCR transcript shows, the challenged statement was factually accurate, that is, that Crawford's defense did come from the voicemail evidence that the State (albeit belatedly) provided to the defense. Counsel testified on cross-examination that she received the evidence seven months into the process and that, as a result, it gave her "six months with the information to play catch-up on developing that theory of the case. So it basically cut the time that I usually use to prepare a murder trial." *Id*. at 27. Nevertheless, she went on to testify, "If I had needed a continuance, I would have asked for one." *Id*. at 28.

[19]  Counsel's failure to object to the prosecutor's comment did not amount to ineffective assistance. First, Counsel admitted that it took her over a year to break down the comment and assess what was wrong with it. Even then, she

concluded that the *comment* was "pervasive," "penetrating," and "devastating" to the entire process of gathering evidence and turning it over to the defense. *Id*. at 20. If anything, the State's *action* in withholding the voicemail evidence was devastating to evidence gathering. Notwithstanding, the State committed the *Brady* violation six months before trial, and Counsel chose not to file a motion for continuance. Counsel was personally offended at the prosecutor's comment during closing argument yet could not pinpoint why. As such, it is unlikely that she could have articulated a basis for her objection, and it likely would have been denied. The jury was very likely unaffected by the statement, as the basis for its objectionability was unclear even to trained counsel and as the physical evidence implicating Crawford was overwhelming. We conclude that Crawford has failed to establish any prejudice stemming from Counsel's failure to object to the prosecutor's comment. As a result, he has failed to meet his burden of establishing ineffective assistance of counsel. Accordingly, we affirm.

[20] Affirmed.

Kirsch, J., and May, J., concur.