FILED

Oct 08 2019, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marty Friend,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | October 8, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2359<br><br>Appeal from the Elkhart Superior<br>Court<br><br>The Honorable Teresa L. Cataldo,<br>Judge<br><br>Trial Court Cause No.<br>20D03-1509-FA-20 |

**Baker, Judge.**

[1] Marty Friend appeals his conviction for Level 1 Felony Child Molestation,[1] arguing that the trial court erred by denying his motions for preliminary discovery of privileged records and by refusing to admit certain evidence. Finding no error, we affirm.

# Facts

[2] In 2010, Friend and his wife, Kathy Friend (Kathy), adopted seven-year-old A.F. from a Russian orphanage and brought her to Indiana. A.F. had trouble adjusting to life in the United States. She did not follow rules, did not respect her teachers' authority, and was terrified to sleep in a room by herself. A.F. would often sleep on the floor of her parents' bedroom and felt confused and alone because of the language barrier. A.F. would aggressively wrestle with her classmates "because of the way that she was used to playing with other kids" in Russia. Tr. Vol. IV p. 129. A.F. was repeatedly cited for bullying and frequently got into trouble. A.F. would often laugh at inappropriate times in class and was unable to communicate her true feelings due to her poor English skills. A.F. and Friend had difficultly bonding during this period and for most of her childhood.

[3] After Friend and Kathy divorced in the summer of 2012, Kathy, who had physical custody of A.F., moved with the child to Bloomington. A.F. stayed

---

[1] Ind. Code § 35-42-4-3(a)(1).

with Friend in Kokomo every other weekend. During those visits, Friend and A.F. constantly fought and called each other names. A.F. complained about the time she had with Friend, and Kathy noticed that A.F. would return from these weekend visits "unkempt, hadn't showered[] . . . like an animal." *Id.* at 184. Also, A.F. continued to have academic and social problems at school.

[4] In 2014, Kathy became so worried about A.F.'s condition that she arranged for A.F. to see a private social worker, Kate Creason. As part of her overall evaluation, A.F. was assessed for Reactive Attachment Disorder (RAD), which is a psychological condition that results from a lack of an intimate bond between parent and child during infancy. RAD is often diagnosed in adopted children due to their sometimes unstable upbringing; it is characterized by meanness, physical aggression, lying, cruelty to animals, and an apparent lack of empathy. Creason did not diagnose A.F. with RAD, and neither Friend nor Kathy received records or other documents from those sessions.

[5] In February 2015, when A.F. was in sixth grade, Kathy received a phone call from the school therapist telling her that A.F. was cutting her wrist with a dull knife. Kathy talked with A.F. and asked her what had been going on. Unable to put her thoughts into words, A.F. wrote down the following passage in a notebook:

> Dad touches me inappropriate places
>
> down their and up their and last Friday
>
> he made me suck it

like he put his thing in my thing ☹

Appellant's App. Vol. II p. 37; State's Ex. 5(A) (capitalization, punctuation, and spelling in original). Kathy promised A.F. that she would stop it.

[6] A.F. testified that Friend had started molesting her during weekend visits just after he and Kathy split up and divorced in 2011-12. Friend would give A.F. a back massage and then start to move his hands "[a]ll over [A.F.'s] body." Tr. Vol. V p. 149. Friend's hands would then move to and grope A.F.'s breasts and vagina. Friend would squeeze A.F.'s breasts and insert his fingers into her vagina. A.F. stated that "[i]t didn't feel bad, but it was confusing." *Id.* at 153. Friend would then direct A.F. to put her hands on his penis and move them up and down until "[w]hite stuff," *id.* at 161, came out of his body. Friend also directed A.F. to put her mouth on his penis until the same thing happened. All the while, Friend twice ordered A.F. "not to tell [Kathy]." *Id.* at 171.

[7] On September 2, 2015, the State charged Friend with one count of Class A felony child molestation and one count of Level 1 felony child molestation. On March 7, 2016, Friend filed a verified motion seeking all medical records from A.F.'s one-on-one sessions with Creason. Friend argued that Creason's reports might contain information that A.F. had been diagnosed with RAD, and consequently, that she could have been lying about the molestation allegations. Following a August 5, 2016, evidentiary hearing on the motion, the trial court denied Friend's request, finding that Friend "has simply not made a substantiated claim that the records he seeks do in fact contain material or

exculpatory information." Appellant's App. Vol. II p. 123. Friend filed two motions to reconsider, including one request that the trial court conduct an in camera review of the materials and one request to seal the records, which the trial court denied on December 21, 2016, and August 30, 2017, respectively.

[8] On October 4, 2017, Friend filed a notice of intent to use evidence in the form of 137 emails and text messages along with testimony from expert witness Dr. Gerald Wingard. In response, the State filed a motion in limine seeking to exclude that evidence. Friend requested a pretrial admissibility ruling on this motion. Following a hearing, the trial court issued an order on May 9, 2018, granting the State's motion and excluding the evidence from trial. The trial court denied Friend's motions to reconsider on July 31, 2018.

[9] Following Friend's August 20-23, 2018, jury trial, Friend was found guilty of Level 1 felony child molestation but not guilty of Class A felony child molestation. Thereafter, on September 20, 2018, the trial court sentenced Friend to forty years imprisonment in the Department of Correction, with ten years suspended to probation. Friend now appeals.

# Discussion and Decision

## I. Preliminary Discovery

[10] First, Friend argues that the trial court erroneously denied his requests for preliminary discovery of A.F.'s privileged records. First, he argues that some of the information in those records might have been material to his defense. Next,

he argues that his federal constitutional rights entitle him to the records so that he may construct a complete defense.

[11]    We will reverse discovery matter rulings "only where the trial court has reached an erroneous conclusion which is clearly against the logic and effect of the facts [and circumstances] of the case." *Pioneer Lumber, Inc. v. Bartels*, 673 N.E.2d 12, 15 (Ind. Ct. App. 1996). "Due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal." *Id.* "We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court." *Williams v. State*, 819 N.E.2d 381, 384-85 (Ind. Ct. App. 2004).

### *Materiality and Privilege*

[12]    Friend sought A.F.'s records from her one-on-one sessions with Creason, the social worker, arguing that the results of the RAD evaluation were essential to Friend's defense that A.F. was fabricating the molestation allegations. Lying, a lack of empathy, and aggressive behavior are well-known symptoms of RAD, so Friend contends that proof that A.F. was diagnosed with the disorder was material to his claim that A.F. had been lying.

[13]    In *Jorgensen v. State*, our Supreme Court held that:

> [w]ith respect to *nonprivileged information*, there are two principal questions which a trial court must consider in ruling on questions relating to discovery in a criminal trial: (1) is there a sufficient designation of the items sought to be discovered; and (2) are the items sought material to the defense? If the answers to both questions are affirmative, the trial court must grant the discovery

motion unless the State makes a showing of paramount interest in nondisclosure.

574 N.E.2d 915, 917 (Ind. 1991) (emphasis added). So, we must first decide whether information is privileged before we conduct a *Jorgensen* inquiry. If it is privileged, the *Jorgensen* inquiry does not apply. If it is not privileged, the *Jorgensen* inquiry does apply and we must conduct that inquiry. "Put differently, [if] there is no chance that the information sought . . . is anything other than privileged[] . . . that ends the inquiry." *In re Crisis Connection, Inc.*, 949 N.E.2d 789, 795 (Ind. 2011).

[14] In Indiana, "privileges are statutory in nature and . . . it is within the power of the legislature to create them." *State v. Pelley*, 828 N.E.2d 915, 918 (Ind. 2005). Indiana Code section 25-23.6-6-1 states that "[m]atters communicated to a counselor in the counselor's official capacity by a client are privileged information and may not be disclosed by the counselor to any person," except under specific circumstances enumerated in the statute. The statutory definition of "counselor" includes social workers. I.C. § 25-23.6-1-3.8.

[15] Our Supreme Court has defined the importance of this privilege:

> By enacting I.C. § 25-23.6-6-1 the Legislature extended to counselors the same privilege that exists for physicians. The intent and dominant purpose of the statute is to grant a privilege to protect confidential communication between a counselor and the counselor's client. . . . [T]he focus of [the privilege] is the same, namely, protecting communication.

*Pelley*, 828 N.E.2d at 918-19. The record plainly shows that the documents compiled during the course of A.F.'s one-on-one sessions with Creason are privileged and may not be disclosed unless they fall under one of the statutorily-defined exceptions—none of which apply here. Because this information is privileged, we may not conduct a *Jorgensen* inquiry. Friend is not entitled to relief on this basis.

## *Friend's Constitutional Rights*

[16] Next, Friend argues that his federal constitutional rights entitle him to Creason's records so that he may present a complete defense.

[17] It is well settled that "criminal defendants have the right to the government's assistance . . . to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). To that end, "*the government* has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Id.* at 57 (emphasis added). In contrast, our Supreme Court has held that non-government actors are not compelled to produce evidence under the Sixth or Fourteenth Amendments. *In re Crisis*, 949 N.E.2d at 799-800. Because Creason is not a government actor, she cannot be compelled to produce documents as if she were a prosecutor under a *Ritchie* analysis.[2]

---

[2] Additionally, the State is correct in pointing out that it did not receive an "unfair advantage" regarding its access to the records. For one thing, there is no proof that the State had these records in its possession. And if the State had the records, it would be compelled under *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), to

[18] Friend also argues that the trial court should have conducted an in camera evaluation of these privileged records. But, "Indiana's [counselor-client] privilege is one that *generally* prohibits disclosure for even *in camera* review of confidential information." *Id.* at 802 (emphases in original). Our Supreme Court has reasoned that a criminal defendant's rights to a fair trial and to present a complete defense are well protected by "extensive access to other sources of evidence." *Id.*; *see also In re WTHR-TV*, 693 N.E.2d 1, 5 (Ind. 1998) (holding that liberal rules of discovery allow a defendant to access information that does not disturb privilege and does not invoke a constitutional analysis). Friend had ample opportunities during his trial to access non-privileged information to show that A.F. was showing symptoms of RAD. We cannot say that Friend's constitutional rights were violated under these circumstances.

[19] In sum, we find that the trial court did not err by denying Friend's requests for pretrial discovery of privileged records.

## II. Admission of Pretrial Evidence

[20] Next, Friend argues that the trial court erroneously refused to admit certain pretrial evidence—namely, (1) written and testimonial evidence proffered to

---

disclose them if they contained exculpatory information. Based on what we can gather from the record, only Creason maintained the documents at all times as a private, independent, non-government actor.

prove that A.F. suffered from RAD;[3] and (2) additional evidence proffered to prove A.F.'s biases against Friend.

[21] Reversal of a trial court's admissibility determination is appropriate only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997). "Moreover, we will sustain the trial court['s] [decisions on the admission of certain evidence] if it can be done on any legal ground apparent in the record." *Jester v. State*, 724 N.E.2d 235, 240 (Ind. 2000).

### *RAD Evidence*

[22] First, Friend argues that the trial court erred when it refused to admit his proffered evidence that, Friend alleges, proved that A.F. had been suffering from RAD. Specifically, Friend submitted 137 exhibits containing text messages and emails between Kathy and A.F. and between Friend and A.F. along with testimony from Friend's expert witness, Dr. Wingard.

[23] In its pretrial order excluding this evidence, the trial court stated the following:

> [Friend] seeks to introduce two (2) primary types of evidence at the trial in this matter, which he classifies as "behavioral evidence" related to Reactive Attachment Disorder (R.A.D.). This topic has been heavily litigated in this case through various motions. [Friend] initially sought discovery of A.F.'s therapy

---

[3] Friend also argues that the trial court erroneously omitted this evidence from the record, thereby preventing us from reviewing his evidentiary appeal. However, this argument is moot because Friend's exhibits and evidence eventually became part of Clerk's Record, and henceforth, the record on appeal. *See generally* Appellant's App. Vol. V.

records and confidential notes compiled by counselor Kate Creason. Throughout the Court's review and consideration of [Friend's] numerous motions on this issue, the conclusion reached is that A.F. has not absolutely been diagnosed with R.A.D. syndrome. At the evidentiary hearing held on December 20, 2017, Dr. Gerald Wingard testified that based only on documents of text messages exchanged between [Friend], A.F., and [Kathy], he was viewing mere "glimpses of behavior" of A.F. There is no indicia of evidence that A.F. actually suffers from R.A.D. other than speculation on the part of [Friend]. Furthermore, [Friend] has not discovered any witness to the State to form the basis to elicit any such testimony, nor has any expert reports or records been provided in support of such opinion.

The information before the Court does not support permitting a defense regarding that A.F. suffers from R.A.D. because it has not been established that she does. Evidence of such a diagnosis, its signs and symptoms, without any basis or evidence that A.F. actually suffers from R.A.D. amounts to jury speculation at best. In this regard, such evidence is prejudicial as it lacks foundation. As noted by the Court in previous orders, [Friend] is certainly free to test A.F.'s credibility and conduct impeachment in any permissible manner. However, direct testimony about R.A.D. to suggest that A.F. might suffer from it would be misleading. Accordingly, [Friend's] Request for Admissibility of Behavioral Evidence is denied.

Appellant's App. Vol. III p. 194-95.

[24] As a general matter, any relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Ind. Evidence Rule 403.

[25] Nothing in these exhibits of text messages or emails indicates that A.F. is suffering from RAD. In fact, many of the conversations between A.F. and

Friend are quite positive, undercutting Friend's arguments that A.F. "consistently called Friend names, was disrespectful of adults, lied, stole, was mean and aggressive towards others, blamed others for her issues, was angry, triangulated adults against one another, demanded gifts, and presented unusual, possibly even delusional, behavior." Appellant's Br. p. 41. And, without an official diagnosis or, at the very least, a more solid foundation that Friend was actually suffering from RAD, the trial court did not err by concluding that this bevy of information should be excluded.

[26] Moreover, Evidence Rule 403 precludes needlessly presenting cumulative evidence. It is not unreasonable to find that the 137 exhibits of text messages and conversations between A.F. and Friend and A.F. and Kathy, in addition to the lengthy testimony of Dr. Wingard, amounted to cumulative evidence. *See, e.g.*, *Morse v. Davis*, 965 N.E.2d 148, 160 (Ind. Ct. App. 2012) (finding that in a medical malpractice action, the exclusion of *one* additional chart proving a family history of cancer was not in error because it was cumulative of other evidence that was already proffered to demonstrate a patient's failure to inform). Friend was already planning to, and in fact did, argue that A.F. suffered from RAD and submitted evidence in support thereof, so an endless review of the text messages would have been superfluous.

[27] Friend also maintains that Dr. Wingard should have been permitted to testify. Dr. Wingard would have testified as follows:

> [A.F.] needs an evaluation now. I obviously was present when Mr. Friend was testifying and said that a RAD assessment had been

done but had not been given any information about it. I'm not sure what an evaluation—what good an evaluation does if there—if parents are not notified about the results; but there's—there's no question that the list of exhibits that I've just gone through would say we need to do an in-depth psychological evaluation.

Tr. Vol. II p. 194. Dr. Wingard admits that he had not witnessed any of A.F.'s symptoms nor had he conducted an independent evaluation of A.F. Rather, all of Dr. Wingard's conclusions about A.F. *potentially* suffering from a psychological disorder were based on conjecture, and he merely speculates that A.F. needs a psychological evaluation sometime in the future. In other words, there was no foundation laid for Dr. Wingard's conclusions. Therefore, the trial court did not err by precluding this testimony.

[28]     Moreover, if the trial court did err by excluding this evidence, the error was, at most, harmless. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party." *Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014). The decision to exclude evidence is harmless if its probable impact on the jury is sufficiently minor. *Id.* Here, the decision to exclude was harmless because Kathy, Friend, and A.F. all testified at trial as to A.F.'s ongoing behavioral issues. While Friend did not get a chance to question Dr. Wingard as an expert witness, these witnesses nevertheless discussed A.F.'s problems of communicating her problems, lying to Friend, complaining of her weekend visits to Friend's home, having thoughts of worthlessness, overcoming the language barrier, behaving strangely, and even performing self-harming acts. The 137 exhibits and Dr.

Wingard's potential testimony would have only expounded upon A.F.'s behavioral issues, proving that Friend's substantive rights were not affected by the exclusion.

[29] Thus, the trial court did not err when it refused to admit Friend's proffered evidence about A.F. allegedly suffering from RAD.

### Bias Evidence

[30] Next, Friend argues that the trial court erred when it refused to admit his proffered evidence that, Friend alleges, tends to show A.F. was biased against him. Specifically, Friend moved to admit evidence that A.F. once stole money from another person; that A.F. once falsely said that their dog was dead; and that A.F. had taken and deleted inappropriate photos of herself on a phone.

[31] Indiana Evidence Rule 616 says that "[e]vidence that a witness has a bias, prejudice, or interest for or against any party may be used to attack the credibility of the witness." We have recognized that evidence of bias, prejudice, or ulterior motives is relevant at trial because it may discredit the witness or affect the weight of the witness's testimony. *Kirk v. State*, 797 N.E.2d 837, 840 (Ind. Ct. App. 2003). However, for such evidence to be admissible, the defendant must demonstrate that he was prejudiced, or else there is no error in excluding it. *Id.* at 840-41.

[32] On its face, none of this evidence shows that A.F. was biased against Friend. These three disparate incidents merely consist of A.F. acting erratically and doing something characteristic of someone who has ongoing behavioral issues

or is simply a rebellious teenager. The actions of stealing money from someone, lying about a dead dog, and taking and deleting photos have no bearing on Friend's case, and he makes no cognizable claim that any of these incidents actually prejudiced him. Instead, Friend contends, without any further explanation, that all of these incidents "present evidence that A.F. was lying in retaliation for Friend's punishment of her escalating behavior in the months before the accusation." Appellant's Br. p. 47.

[33] Moreover, Friend had ample opportunity to cross-examine both A.F. and Kathy during trial to probe for genuine pretext and bias. Nevertheless, Friend narrows in on these random events, which neither relate to nor support his argument that A.F. was so biased against him as to fabricate molestation allegations. While a party may inquire into such collateral matters on cross-examination, those collateral matters cannot be "used in a manner solely to prejudice a jury against a witness and [are] not material to the litigation[.]" *Kien v. State*, 782 N.E.2d 398, 409 (Ind. Ct. App. 2003). These "evidentiary harpoons" are pieces of evidence that would not be independently admissible, and therefore, their admission even on cross-examination is improper. *Id.* Because Friend does not present any cogent argument that he was prejudiced by these events and because these events are not independently relevant or material, we find that the trial court did not err by refusing to admit them.[4]

_____

[4] As a final matter, Friend also argues that the trial court erred when it *did* admit evidence of A.F.'s written disclosures and journal entries, wherein A.F. described the molestation and her strained relationship with

The judgment of the trial court is affirmed.

Kirsch, J., concurs.
Crone, J., concurs in part and dissents in part with a separate opinion.

---

Friend. We find that, at most, the trial court committed harmless error. "The erroneous admission of evidence that is merely cumulative of other admissible evidence is not grounds for reversal." *Crawford v. State*, 770 N.E.2d 775, 781 (Ind. 2002). It was firmly established at trial that Friend and A.F. had a strained relationship, and A.F. testified at length about how and when Friend molested her. Therefore, the admission of the journal entries and written disclosures was merely cumulative of evidence already presented.

Marty Friend,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
18A-CR-2359

**Crone, Judge, concurring in part and dissenting in part.**

[35] I respectfully disagree with the majority's conclusion that the trial court did not abuse its discretion[5] in denying Friend's request for pretrial discovery of social worker Creason's records. The majority states that "we may not conduct a *Jorgensen* inquiry" because "[t]he record plainly shows that the documents compiled during the course of A.F.'s one-on-one sessions with Creason are privileged[.]" *Id*. at 8. Although the matters that A.F. communicated to

---

[5] "Our standard of review in discovery matters is abuse of discretion." *Williams*, 819 N.E.2d at 384. "This applies to requests for in camera review of items to determine if they are discoverable." *Id*.

Creason are specifically privileged pursuant to Indiana Code Section 25-23.6-6-1, Creason's diagnosis of A.F. is not.[6] The State does not argue that the diagnosis is insufficiently particular or immaterial for purposes of *Jorgensen*, and any such argument would be meritless.

[36]     But even assuming that the diagnosis is otherwise privileged and/or that Creason's records might contain other privileged information material to Friend's defense (such as statements by A.F. that might be mentioned in Creason's RAD evaluation), "the privilege must yield to [Friend's] constitutional rights." *Crisis Connection*, 949 N.E.2d at 795. "In determining whether [Friend's] constitutional right to present a complete defense would be violated by nondisclosure of [Creason's] records, we weigh the interest advanced by Indiana's [counselor-client] privilege 'against the inroads of such a privilege on the fair administration of criminal justice.'" *Id*. at 801 (quoting *United States v. Nixon*, 418 U.S. 683, 711-712 (1974)). The interest advanced by the counselor-client privilege is substantially similar to that advanced by the victim advocate privilege at issue in *Crisis Connection*, namely, to foster "an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears." *Id*. (quoting *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996)).

---

[6] The majority states that "Creason did not diagnose A.F. with RAD[.]" Slip op. at 3. In fact, the record is silent regarding Creason's diagnosis.

[37]     Unlike the victim advocate privilege, however, the counselor-client privilege is not absolute; Indiana Code Section 25-23.6-6-1 authorizes the disclosure of privileged information under certain circumstances, including "[c]ircumstances under which privileged communication is abrogated under Indiana law." Friend argues (persuasively, in my view) that this "catchall exception illustrates the Legislature anticipated that some interests will trump the need for counselor-client confidentiality, thus clearly distinguishing this case from [*Crisis Connection*]." Appellant's Br. at 29. He further argues that

> the fair administration of justice trumps the interests of protecting the client-counselor confidentiality within A.F.'s records. Friend tried every possible avenue to discover whether A.F. suffered from RAD and to present such evidence but was unsuccessful at every turn. He translated records from the [Russian] orphanage and had an expert review A.F.'s behaviors to explain them. The trial court held that all of it was inadmissible without a diagnosis of RAD, which of course, Friend could not discover because of the privilege.[7] Further, there is a strong likelihood that Friend would discover material evidence within the records. This is a rare case where the defendant knows there was a RAD assessment, but just does not know the results. Health care providers do not test for disorders they have no reason to think exist.[8]

> In a criminal context, the counselor-client privilege unfairly favors the prosecution over the defense. If an alleged victim's

---

[7] This is precisely the kind of "catch-22" that our supreme court confronted in *Jorgensen*. 574 N.E.2d at 917.

[8] The State asserts that "[t]he fact that Creason never told either parent that A.F. had RAD is extremely strong evidence that the result of her evaluation was a conclusion that A.F. did not have RAD." Appellee's Br. at 29. This is pure speculation.

counseling records are helpful, the alleged victim has the choice to waive the privilege so they can be used. However, when there are relevant psychological issues, inconsistent stories or motives to lie that may undermine the alleged victim's credibility, the alleged victim will most likely not waive the privilege. Thus, the real-world application of the privilege is unbalanced for the State.

*Id.* at 33-34 (citations omitted). Under the facts of this particular case, at least, I must agree. *See Turney v. State*, 759 N.E.2d 671, 678 (Ind. Ct. App. 2001) ("In sex-related cases, which often turn largely on questions of credibility, we are ever mindful that: 'The jury's estimate of the truthfulness and reliability of a witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.'") (quoting *State v. Bowens*, 722 N.E.2d 368, 370 (Ind. Ct. App. 2000)), *trans. denied* (2002).

[38]    In *Crisis Connection*, the court expressed its concern that "if the records protected by Indiana's victim advocate privilege were subject to even an *in camera* review in cases like the present one, 'confidential conversations between [victim advocates and victims] would surely be chilled, particularly when it is obvious that the circumstances that [gave] rise to the need for treatment will probably result in litigation.'" 949 N.E.2d at 801 (quoting *Jaffee*, 518 U.S. at 11-12) (alterations in *Crisis Connection*). Friend points out, however, that Creason's records in this case

> originated from counseling with nothing to do with alleged abuse and everything to do with A.F.'s behavioral issues and a failure to bond with Friend, which itself could be a motive for a false

accusation.  Friend paid for the sessions and even participated in them.  Had Friend not been accused of molesting A.F., he would have full access to the records.

Appellant's Br. at 34 (citing Ind. Code §§ 16-39-1-7 and 16-39-2-9).[9]  Based on the foregoing, I agree with Friend that "the interest in maintaining confidentiality of A.F.'s counseling is outweighed by the need for fair administration of justice regarding the truth of A.F.'s accusation."  *Id.*

[39]     Accordingly, I would hold that Friend "is entitled to know whether [Creason's] file contains information that may have changed the outcome of his trial had it been disclosed" and therefore "a remand is necessary" for an in-camera review by the trial court.  *Ritchie*, 480 U.S. at 61.  If the review would reveal information that would have been material to Friend's defense, then the trial court would have to "determine whether to grant a new trial by viewing such information as newly-discovered evidence and applying the law as it relates to

---

[9] Indiana Code Section 16-39-1-7 reads in pertinent part,

> (a) Except as provided in subsection (b), a custodial parent and a noncustodial parent of a child have equal access to the parents' child's health records.
>
> (b) A provider may not allow a noncustodial parent access to the child's health records if:
>
> > (1) a court has issued an order that limits the noncustodial parent's access to the child's health records; and
> >
> > (2) the provider has received a copy of the court order or has actual knowledge of the court order.

Section 16-39-2-9 contains similar provisions regarding a child's mental health records.  There is no statute that specifically addresses counseling records.  Friend notes that the State "provided no reason [at the trial level] why the Legislature would treat counseling records different than other mental health records" and that the foregoing statutes "illustrate that children have less expectation of confidentiality when it comes to their pre-accusation disclosures."  Appellant's Reply Br. at 10.

newly discovered evidence." *Jorgensen*, 574 N.E.2d at 918; *see Denney v. State*, 695 N.E.2d 90, 93 (Ind. 1998) (to warrant a new trial based on newly discovered evidence, it must be shown "that the evidence (1) has been discovered since the trial; (2) is material and relevant; (3) is not cumulative; (4) is not merely impeaching; (5) is not privileged or incompetent; (6) was not discoverable upon due diligence in time for trial; (7) is worthy of credit; (8) can be produced on a retrial of the case; and (9) will probably produce a different result.").[10]

[40]  All that being said, I agree with the majority's determination that the trial court's other evidentiary rulings did not constitute reversible error. It bears mentioning, however, that the trial court's rationale for excluding Dr. Wingard's proffered testimony regarding RAD would stand on much shakier ground if Creason did in fact diagnose A.F. with RAD.

---

[10] I would decline Friend's request to remand with instructions to order Creason's record transmitted to this Court for review, as the trial court would be in a superior position to determine whether any newly discovered evidence will probably produce a different result on retrial.